[No. 29591. *En Banc.* August 30, 1945.]

ALFRED SAKSHAUG, *as Administrator, et al., Appellants,* v. WILLIAM H. BARBER *et al., Respondents.*[1]

*Wright & Wright (John Kelleher, of* counsel), for appellants.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for respondents.

[1]Reported in 161 P. (2d) 536.

MALLERY, J.—Plaintiffs brought an action to recover damages for the loss of services and burial expenses of their son, John Sheldon Sakshaug, a minor, age twelve years, who was killed by a collision with an automobile driven by defendant William H. Barber.

A trial to a jury resulted in a verdict for plaintiffs. Thereafter defendants presented their motions for a new trial and for judgment notwithstanding the verdict. The court granted the motions and in so doing ruled that if the order relative to judgment notwithstanding the verdict should be reversed, defendants would be granted a new trial because the verdict of the jury was not supported by the weight of evidence and "substantial justice had not been done by reason of the verdict." Judgment dismissing the action was then entered. Plaintiffs have appealed to this court and assign as error the granting of the motion for judgment notwithstanding the verdict and for a new trial.

The accident happened on the Brownsville road, at its junction with a road coming from the west, but which did not continue to the east of the Brownsville road. It occurred shortly after school let out in the afternoon, while the boy was on his way to play basketball near his home. His route to join his companions in the game led down the side road to the left from the road on which he had been traveling. The side road was graveled and had a well-defined approach extending some seventy-six feet along the Brownsville road. The road upon which the parties were traveling was of hard-surfaced macadam, twenty-eight feet wide from shoulder to shoulder, with a line painted in its center. The boy was riding his bicycle in a northwesterly direction, slightly downgrade, and was followed by his dog and William Barber, who was driving his Ford V8 automobile. It was while the boy was making a left turn and the respondent was attempting to pass him that the accident occurred.

The only living witness to the accident was respondent William Barber. He was acquainted with both roads and was driving at a speed of thirty miles per hour and slowed

down when he saw the boy in front of him. We quote from his testimony as follows:

"Q. How far were you back from this boy when he held out his hand? MR. McKELVY: We object to that—his assuming something. Q. Did you see the boy hold out his hand in front of you? THE COURT: That is all right. A. He didn't hold his hand out. He held it up. Q. Did you have a conversation with Mr. Sakshaug, after that? A. No, he held up his hand. Q. Where was the boy when he held up his hand, as you say? A. On the right-hand side of the road. Q. How far on the right-hand side? A. Where he belonged. Q. That can be anywhere. On the yellow line, or where, in relationship to the side of the road? A. Over to the·right-hand side of the road. Q. You went past him? A. No, sir. Q. If you never passed him, how did you hit him? A. I didn't hit him. He hit me. Q. You knew there was a road turning to the left just about where you saw this boy or just before he got to that, didn't you? A. That was some 800 feet before the boy got to this road. Q. Where was the boy lying after the accident? A. In the road. Q. Where, in reference to this side road? A. Well, — Q. Just answer the question. You attempted to pass him 800 feet back? A. There was a little dog ran, — . . . Q. Now, you were trying to miss the dog, were you? A. I wasn't trying to miss him. I was waiting for him to get out of the road. Q. Didn't you know this road turned to the left at this point? A. Well, I presume I did, but its not a road very much travelled, although it is a road the farmers use to get up there. Q. It is a well-travelled road? A. I don't know —yes, I guess. Q. Well-used. Did you tell Mr. Sakshaug, some day or so after this accident that you, in effect, knew you were wrong—that if you had this to do over again, you wouldn't go by there? A. No, sir, I didn't say that. . . . Q. About how fast were you going when you slowed down? You told Counsel you slowed down because of the dog and the boy? A. Ten miles an hour when I slowed down for the dog. The dog was quite long and·a few inches high—very small curly-haired dog. Q. After the dog had gone by, what did you do? A. I naturally speeded up to go by the boy. Q. Have you any idea what speed the boy was going? A. I'm no judge of speed on a bicycle. He was going down a grade—going right along. I wouldn't say his speed. I'm not·sure of it. He was pedalling right along down the grade. Q. So·far as bicycles go, was he going fast or slow? A. He was going a very good speed for a bicycle. Q. I wasn't

just clear what part of the pavement he was travelling? A. The pavement? Q. The right edge? A. On the right-hand side of the road. I couldn't say definitely. I think he was over plenty far enough—where he belonged. Q. Did you see the bicycle when it actually colided with your car? A. No. Q. Tell us what happened when you went by the bike? A. I lost my vision of him. I couldn't see him at all. He was on the side of me. When the bicycle struck, I don't mind saying, it kinda confused me when that hit me because I didn't realize what it was for an instant, and I guess it would be confusing to anyone that had an accident of that kind. Q. What part of the automobile did the bicycle come in contact with? A. Between the running board and the fender— right where it connects on. Q. When you last saw the boy, he was travelling down the road on the right-hand side? A. Yes. Q. Do you recall whether he was going straight ahead or turning? A. Straight ahead. Q. Did he ever made any signal of his intentions of making a left turn by extending his hand to the left? A. The only signal he made was some 800 feet from me, when he held up his hand when I blowed my horn and he turned around and looked at me. Q. He turned around and looked at you. When this bicycle sped into the side of your car, did you apply the brakes or not? A. Yes."

Additional evidence furnished by another witness showed that the windshield on the right side of the car was broken, and that there was a slight dent on the right running board. There were skid marks fifteen feet in length near the scene of the accident on the left, or west, side of the highway, approximately a foot from the yellow line. Immediately after the accident, the boy was found on the center of the main road, opposite the entrance to the road coming from the west. One witness stated that Barber's car was seventy or seventy-five feet from the place where the boy was lying.

Appellant Alfred Sakshaug testified that shortly after the accident he had a meeting with Mr. Barber and that the following conversation occurred:

"What did he tell you? Just tell the jury what he told you about this accident? A. Well, I went up to see him. It was about a month afterwards. So I went up to see him and I went to talk to him. I told him that I was father to the boy that was killed and I had never seen him before in

my life. I asked him if his name was Barber and he said, 'Yes.' I said, 'I wanted to talk to you about it.' And I says, 'You never came to see me and I thought I would see you and,' 'Well,' he says, 'I have been pretty busy but didn't Mr. Jenner, —' MR. WRIGHT: Just a minute. Jenner doesn't have anything to do with it. Q. Just tell about how it happened. A. He said, 'I've been pretty busy and I couldn't come to see you.' Q. Then, did you discuss what happened at the accident? A. Yes. Q. What did he say? A. He said, 'I was driving down the road and I seen the boy and he held out his hand. I didn't know what he meant and I didn't know that road was there.' Q. He said he didn't know that side road was there? A. Yes. He said, 'The next time I see a boy like that, I'm going to slow down and see what he means.' Then he told me about the dog in the middle of the road. Q. What did he say about that? A. He said, 'If it hadn't been for that dog, I might have gotten by the boy. Q. Was that in substance, what he said? A. Yes. Q. Did he say the boy held up his hand? A. Out. Q. The boy held out his hand. And he said the next time he saw a boy hold his hand out, he was going to see what he wants? A. Yes. Q. Did he say anything about the boy looking back? A. I couldn't say whether he said he looked back or not. . . ."

Barber denied the statement made by Mr. Sakshaug.

In considering this case, it is of interest to note the following evidence given by Mrs. Sakshaug relative to the knowledge her son had of the rules of the road:

"Q. How long had this boy rode a bicycle? A. Oh, quite awhile. Q. He was a good rider? A. Oh, yes. He and a couple of boys rode bicycles. He was careful and knew all the rules. Q. He knew all the rules? A. Yes, indeed. Q. And was a very good rider? A. Yes. Q. Knew all the traffic rules, the same as an adult? A. Well, when it came time for licenses and different laws, he had to be informed —he was a boy that way. He had to find out. Q. He had rode quite a bit so he had lots of experience riding a bike? A. Yes."

In considering the question relative to the motion *non obstante veredicto*, we have in mind the rule that no element of discretion is present, and the motion will not be granted unless the court can say as a matter of law that there is neither evidence nor reasonable inference

from evidence sufficient to uphold the verdict. Further, that in passing upon such motion, the evidence must be viewed in a light most favorable to the parties against whom the motion is made, and that all material evidence favorable to the parties benefited by the verdict must be taken as true. Substantial evidence supporting the verdict compels a denial of the motion. *Omeitt v. Department of Labor & Industries,* 21 Wn. (2d) 684, 152 P. (2d) 973.

In this case a timely signal by the boy of his intention to make a left turn would have given him the right of way, and the question of fact as to the giving of such a signal is the crux of the case. Respondent testified:

"Q. Did he ever made any signal of his intention of making a left turn by extending his hand to the left? A. The only signal he made was some 800 feet from me, when he held up his hand when I blowed my horn and he turned around and looked at me."

Thus the signal, however made, was timely. Should the signal given have reasonably put the respondent upon notice of the boy's intention to make a left turn? Some element of reasonable confusion is eliminated by recalling that respondent knew there was no road to the right down which the boy could have turned, and that therefore, if he intended to turn, it would be to the left, in which case he would have the right of way.

The following cases cited announce the rule that a child is not held to the same degree of care as an adult: *Studer v. Southern Pac. Co.,* 121 Cal. 400, 53 Pac. 942, 66 Am. St. 39; *Stockfisch v. Fox,* 275 Mich. 630, 267 N. W. 754; *Bosarge v. Spiess & Co.,* 145 So. (La. App.) 21; *Westman v. Bingham,* 230 Iowa 1298, 300 N. W. 525; *Akin v. Bradley Engineering & Machinery Co.,* 51 Wash. 658, 99 Pac. 1038. The exercise of the required degree of care by an adult in such a situation as is here involved, must of course take this into account. It has a bearing upon the reasonableness of passing in an intersection as if no signal to turn left had been given, where it is conceded a signal was given, and only the sufficiency of the manner of giving it is questioned. We think it was a question of fact for the jury to pass upon.

■ Respondent relies upon *Jones v. Harris*, 122 Wash. 69, 210 Pac. 22; *Kennett v. Federici*, 200 Wash. 156, 93 P. (2d) 333, and *Erickson v. Barnes*, 6 Wn. (2d) 251, 107 P. (2d) 348, and the cases cited therein to uphold the rule that a vital issue is not sustained solely by uncorroborated testimony as to admissions which the adverse party denies having made, where there are no corroborating facts or circumstances. He contends that the appellant's sole support on the issue of the boy's signal for a left turn is the testimony of the father as to his admissions, which we have previously set out. We agree with the rule but think it is not applicable here because of respondent's own testimony touching the giving of the signal, and the corroborative circumstances as to the boy's intentions to turn left, which the jury had a right to infer from his known destination, the route to be followed, the place where the accident occurred, and where the body was found. Indeed it might well be contended that there is a *prima facie* case without the testimony as to the admissions, and that they are merely corroborative of it. However, in any case, they do not stand alone as the appellant's sole support on the issue, and the respondent's contention therefore cannot be sustained.

The judgment notwithstanding the verdict is reversed. However, under the authority of *Bond v. Ovens*, 20 Wn. (2d) 354, 147 P. (2d) 514, the order granting a new trial on the grounds given must be and accordingly is affirmed.

BLAKE and GRADY, JJ., concur.

BEALS, C. J., STEINERT, and MILLARD, JJ., concur in the result.

SIMPSON, J. (dissenting)—In order to recover against respondents, it was incumbent upon appellants to show by substantial evidence that respondent driver was negligent, and that that negligence was the proximate cause of the collision in question. *Peterson v. Mayham*, 10 Wn. (2d) 111, 116 P. (2d) 259.

Appellants' case is founded upon purported admissions made by respondent driver. This court is committed to the rule that admissions alone, denied by the party alleged to

have made them, are not of that substantial character necessary to support an affirmative holding, and that, in such cases, the claimed admissions must be supported by corroborating facts and circumstances before a verdict may be upheld. *Ludberg v. Barghoorn,* 73 Wash. 476, 131 Pac. 1165; *Jones v. Harris,* 122 Wash. 69, 210 Pac. 22; *Low v. Colby,* 137 Wash. 476, 243 Pac. 18, 247 Pac. 475; *Commercial Importing Co. v. Wear,* 180 Wash. 669, 41 P. (2d) 777; *Kennett v. Federici,* 200 Wash. 156, 93 P. (2d) 333; *Erickson v. Barnes,* 6 Wn. (2d) 251, 107 P. (2d) 348.

It must be conceded from the evidence that the boy acknowledged the signal given by respondent and looked back at him. In this case, it becomes necessary to ascertain the duty of the bicycle rider and respondent. In this connection, we must consider three sections of our automobile code because of the situations involved, that of passing a vehicle, and that of turning at an intersection. The duties and rules affecting the parties are imposed by Rem. Rev. Stat., Vol. 7A, §§ 6360-77, 6360-84, 6360-85 [P. P. C. §§ 295-5, 295-19, 295-21]:

"Any person driving a vehicle upon any public highway of this state and overtaking another vehicle proceeding in the same direction shall pass to the left of such overtaken vehicle: *Provided,* That it shall be unlawful for any person to pass any vehicle overtaken unless he shall have a clear and unobstructed view ahead for a distance sufficient for safe passing, all factors considered. *Any person driving a vehicle upon any public highway and being overtaken by any vehicle proceeding in the same direction shall keep to the extreme right-hand side of such public highway* and shall not accelerate his speed until the overtaking vehicle shall have resumed a driving position and speed ahead of him. The overtaking vehicle shall drive clear of the overtaken vehicle and shall continue its overtaking speed until it has passed the overtaken vehicle and shall have resumed its driving position to the right of such public highway. No person driving any vehicle upon any public highway outside incorporated cities and towns and overtaking another vehicle proceeding in the same direction shall overtake such vehicle or drive within a distance of less than fifty (50) feet of such overtaken vehicle for such purpose without first

signaling his intention to pass by use of horn or other sounding device."

"Any person driving any motor vehicle upon any public highway in this state and desiring to make a turn to the right shall seasonably and prudently drive such vehicle as close as is practicable to the extreme right-hand edge of said roadway a reasonable distance before the point of making such turn. *Any person driving any vehicle upon any public highway of this state and desiring to make a left-hand turn at any intersection shall seasonably and prudently drive such vehicle to the extreme left-hand side of that portion of the roadway lying to the right of the center of such public highway a reasonable distance before making such left-hand turn. It shall be unlawful for any person to make or attempt to make any right-hand or left-hand turn until he shall have attained the proper relative driving position as aforesaid.*"

"It shall be the duty of every person operating a vehicle upon any public highway and intending to turn from a standstill or while in motion intending to turn or stop, to give a timely signal from the left-hand side of such vehicle indicating the direction in which he intends to turn or that he intends to stop, as follows: *If he intends to turn to the left he shall extend his arm in a horizontal position from the left side of such vehicle continuously for a reasonable length of time;* if he intends to turn to the right he shall extend his arm from the left side of the vehicle with his forearm raised vertically continuously for a reasonable length of time; if he intends to stop he shall extend his arm from the left side of such vehicle with his forearm lowered vertically continuously for a reasonable length of time. For the purpose of this section, a reasonable length of time shall be that time required to traverse a distance in feet equal to five times the maximum speed in miles per hour allowed by law during the approach to the point of turning or stopping." (Italics supplied.)

It will be noted that the first section above cited required the driver of the automobile to drive clear of the overtaken vehicle. That is just what Barber attempted to do. He even drove over onto his left side of the center of the road in order to keep clear of the bicycle and its rider. Under that section of the statute, it was the duty of the bicycle rider to keep to the extreme right-hand side of the highway until respondent had passed. The boy did not obey that injunc-

tion of the statute. He did not keep to his right side of the road, but moved over to the left-hand side of his portion of the highway, and, in so doing, was guilty of contributory negligence as a matter of law. It was so alleged in defendants' answer.

The majority announces the rule that a signal to make a left-hand turn gives the maker of it the right of way. Does it? A study of the statute does not indicate that that is the rule, and none of our opinions so holds.

The provisions of the two statutes last quoted do not give *the right of way* to the operator of a vehicle about to turn left at an intersection. In any event, this could not be true until a strict compliance of the statute was observed by the person who desired to turn. A reading of the sections indicates the truth of this statement.

The case of *Peterson v. Mayham, supra,* had under consideration an accident which occurred at an intersection in which a driver of an automobile attempted to turn to his left and was run into by a following car. In passing upon the issues presented, we quoted the provisions of the statute relative to left-hand turns and stated:

"Where a statute (Rem. Rev. Stat., Vol. 7A, §§ 6360-84, 6360-85) requires that a motorist turning to the left at any intersection shall seasonably and prudently drive such vehicle to the extreme left-hand side of that portion of the roadway lying to the right of the center of such public highway a reasonable distance before making such a left-hand turn, a motorist, proceeding in the same direction as the one who desires to make a left-hand or 'U' turn, is entitled to assume that the driver engaged in making the left-hand or 'U' turn will govern his conduct by the provision in question."

The rule announced by the majority repeals the statute just quoted in the *Peterson* case. The rule will necessarily change our method of driving in this state, especially in the crowded city streets. From this time on, he who is on the extreme right of a street may stop all traffic on his left by giving a signal indicating a left turn.

If we assume for the moment that an operator of a vehicle obtains the right of way by giving the signal for a left-

hand turn without complying with the other mandatory provisions of the statute, which I have italicized, it must certainly appear that a proper signal was not given, for the reason that the evidence concerning the admission made by respondent does not indicate that holding out his hand proved that he held it out in a horizontal manner; in other words, there is no evidence, direct or circumstantial, that the boy gave the proper signal.

The majority calls attention to the rule which holds that a child is not held to the same degree of care as an adult. This rule was adopted by this court in *Lee v. Independent Dairy,* 127 Wash. 622, 221 Pac. 309, by the approval of an instruction which reads:

" 'That a child in the public street is not a trespasser. His right there is as sacred as his adult neighbor or the owner of the automobile. True, he is charged with the duty of exercising such care for his safety as a child of his years, experience and capacity may fairly be presumed to possess, but the driver of a vehicle of any kind is no less bound to anticipate the presence of children upon the public highway, and to exercise reasonable diligence to avoid injuring them. In so doing, he is not justified in assuming that a young child will manifest the judgment and prudence of an experienced man, and must govern his own conduct with some reasonable degree of respect of that fact.' "

The child killed by the driver of the truck belonging to defendant, Independent Dairy, was of the age of three years. The above rule then has no application here, for the reason that the boy was well acquainted with the rules of the road. The evidence shows that he was twelve years of age, a student in junior high school, and knew, as stated by the majority, all the rules and "had lots of experience riding a bicycle."

The bare fact that an injury has been caused cannot of itself justify by inference that the injury was caused by respondent. *Mahlum v. Seattle School Dist.,* 21 Wn. (2d) 89, 149 P. (2d) 918.

The evidence quoted by the majority does not indicate that the rider of the bicycle complied with either rule, that relating to overtaking vehicles or that relating to left-hand

turns at intersections. If it be admitted that the boy gave a signal, indicating a turn to the left, he would not have been justified in making the turn until he had complied with the provisions of § 6360-85. The signal to turn, if given by the boy, was not timely because he had not complied with the provisions of the statute.

The majority speaks of the boy's "known destination." How, may I ask, can that fact be charged to respondent who had no knowledge that the boy was going to play a game of basketball to the left of the road upon which he was traveling?

The majority opinion lays stress upon the fact that the windshield was broken. To my mind this does not indicate other than that the boy ran into the side of the car. In so doing, he would naturally injure or mark some part of the side of the car and could easily have broken the windshield in so doing. Had he been run into by respondent, then the front of the car, the bumper or the front part of the fender, would have been marked or injured.

There is no more than a scintilla of evidence favorable to appellants in this case. The scintilla of evidence doctrine has been repudiated by this court. *Ruff v. Fruit Delivery Co.,* 22 Wn. (2d) 708, 157 P. (2d) 730.

The judgment of the trial court should be affirmed.

ROBINSON and JEFFERS, JJ., concur with SIMPSON, J.