[No. 30979. Department Two. June 23, 1950.]

DONALD RAY NAGALA, *a Minor, by Herman Nagala, his Guardian ad Litem, Respondent,* v. HERMAN WARSING *et al., Appellants.*[1]

[1]Reported in 219 P. (2d) 603.

*Forest & Forest* and *Thomas E. Grady, Jr.,* for appellants.
*Olson & Palmer,* for respondent.

ROBINSON, J.—This is an appeal from a judgment entered in the superior court of Yakima county in an action brought by Donald Ray Nagala, a minor, through his father as his guardian *ad litem,* against the Yakima Grocery Company and Herman Warsing, to recover damages for personal injuries sustained as a result of his coming in contact with the large van of a delivery truck, at the time being driven by Herman Warsing, as an employee of the grocery company. The jury returned a verdict of $8,908.60 against the defendants and each of them. Defendants moved for judgment notwithstanding the verdict and, in the alternative, for a new trial. In due course, the motions were argued and denied, and judgment entered in accordance with the verdict. From that judgment, the defendants promptly perfected this appeal.

In this opinion, we will, for convenience, refer to the child-plaintiff as the respondent, and the appellants in the singular as if Warsing were the only appellant.

Although the statement of facts contains a great deal of testimony, it does not establish exactly how the accident occurred. No bystander saw the truck come in contact with the boy, and it appears from Warsing's own evidence that he did not see the respondent either before or after the accident. However, the appellant stoutly contends that the respondent boy, who was but three years and ten months old at the time, simply walked or ran into the overhanging van of the grocery truck as it was passing him on the street. That theory appears to be based upon testimony given by Raymond Frye, an officer of the state patrol, that, upon examination of the truck the day after the accident, he found "a light brown hair" adhering to the side of the van, about eighteen inches from the rear thereof. This does not appear to have much, if any, probative significance, since, although

the boy's skull was fractured at the point on his forehead where his hair was parted, we find no testimony in the record that his hair was light brown either at the time of the injury or at the time of the trial. Furthermore, officer Frye did not say on which side of the van the hair was found. We think, however, that the evidence in the case fairly indicates that the boy was not injured by coming in contact with the front of the truck.

The accident occurred on the Power House road just outside the city limits of Yakima, near the intersection of that road and Franklin avenue, which is a black-top highway extending northerly and southerly, and intersects Power House road at a right angle. Power House road is paved with concrete to a width of eighteen feet. There is a dirt shoulder on its north side which is used by the residents of the vicinity as a sidewalk. The shoulder slopes to a shallow drain ditch. The testimony is in conflict as to whether or not there were tall weeds growing in the ditch or on the shoulder. There was a designated bus stop at the southwest corner of the intersection.

Mrs. Nagala testified that, on the morning the accident happened, she found it necessary to take a 9:50 bus at that stop in order to keep an appointment in downtown Yakima. The Nagalas lived in a house north of the Power House road, slightly more than a half block west of the intersection. She left her home shortly before the bus was due, taking little Donald, then three years and ten months old, with her. They walked down the north shoulder of the Power House road nearly to the intersection, and then cut across the road to the bus stop on the southwest corner. As she and the boy were standing near the bus stop, a little girl playmate of Donald's, who lived in that neighborhood, appeared on the other side of the road, that is, at the northwest corner of the intersection, and called to the boy and he ran over to her. Suddenly, the little girl ran across the street to the bus stop where Mrs. Nagala was standing. Mrs. Nagala further testified that there was traffic coming on the road from both directions, and she called and motioned to the boy to stay where

he was, that is, at the northwest corner of the intersection. She further testified that she was particularly concerned with the truck coming from the west and stepped out in the roadway and pointed it out to the boy and told him to stay where he was until that truck passed. The driver of that truck signalled that he was about to make a right turn and sounded his horn as a warning, and she had to step back off the road so that he could do so. That truck was driven by Richard Walker, who was en route to his home on Franklin avenue about a quarter of a mile south of the intersection. Walker was called as a witness at the trial, and his testimony corroborated a great deal of the testimony of Mrs. Nagala, stating that, as he approached the intersection, he saw her standing on the shoulder of the road at the southwest corner, and further saying:

"A. And something brings to my mind that there was a small girl standing beside her or behind her, and I believe I saw a small boy on the northwest side of the intersection—near the intersection, at least."

As the Walker truck was approaching the intersection from the west, Warsing, driving the grocery truck, was approaching it from the east. Warsing, when called as an adverse witness by the attorneys for the plaintiff, testified that it was a clear day and the pavement was dry; that the truck he was driving was five feet wide but had a large overhanging van which was "perhaps six feet in width"; that, as he was about two hundred yards from the intersection, he was driving about twenty-five miles an hour, but at that point he saw a truck approaching the intersection from the west (the Walker truck), and that he slowed down, not knowing which way the approaching truck might turn at the intersection; that, when Walker was making his right turn at the intersection, he (Warsing) had arrived at a point fifty or sixty feet east of it. He was asked if he saw a small child on the north side of the Power House road, and he replied, "No." He was also asked if he saw a woman standing on the pavement after the Walker truck had passed, and again answered, "No." He further testified that, as he had slowed

down a little on account of the Walker truck, he went through the intersection at about twenty-two or twenty-three miles an hour. He further testified that he did not see Mrs. Nagala or the small boy as he passed through the intersection.

"Q. And did you ever see the little boy? A. Not until— until I got beyond, about where—I should judge around about a hundred feet or so. Then I just happened to see something come out of a ditch there, that's what I call it. Q. You say you were about a hundred feet past the intersection? A. Something like that. Q. When you saw something where? A. On my right side."

Exhibit No. 1 is a large plat of the intersection, drawn to scale, and stipulated by the parties to the action to be a correct portrayal of what it purported to represent. Respondent's counsel, who had called Warsing as an adverse witness, after telling him that the plat was drawn on a scale of one inch to five feet and asking him to mark the place where his truck was when he saw some dark object come up out of the ditch, directed him to locate the place where he first saw the dark object come up out of the ditch. He made the mark about one hundred feet west of the intersection. The examination continued as follows:

"Q. In other words, when you first saw this child, he was about a hundred feet west of the intersection and he was not on the shoulder, is that correct? A. That's right. Q. And did you recognize this object as a child? A. No, I did not. Q. What did you recognize it as? A. As nothing; as having a—like a—something moving. Q. Something moving? A. Yes. . . . Q. *You didn't recognize it, the object you saw, as a child? A. No.* Q. Just as something moving. Were you looking straight at this object? A. No, I wasn't. Q. How were you looking at it, I mean? A. Well, just as I drove by, I see at a glance there something moving there, and I just went on. Q. Did you see this object out of the corner of your right eye? A. Yes. *Q. Did you ever recognize this object as a boy? A. No. Q. Or a child? A. No.* Q. What did the object appear to do as you saw it? A. Well, it seemed like it was coming out of the ditch and something was moving there, and that's all I seen. There was weeds there and a little ditch there about a foot and a half to two feet deep." (Italics ours.)

We have made the foregoing quotations of evidence, and will make further quotations, because, in order to give due consideration to the questions raised by the appellant's assignments of error, it is necessary, if possible, to determine where the boy was when he was injured.

Warsing at no time testified that the "dark object," which he saw come out of the weeds, was a child. Counsel, in their questions as to that matter, frequently assumed that it was the respondent boy.

There is ample evidence in the record from which the jury could have found that the dark object which Warsing, the driver of the grocery truck, testified he saw come out of the weeds in the ditch alongside the shoulder, was not the respondent boy. Warsing, as we have shown by quotations from his evidence, marked, on exhibit No. 1, a place where his truck was when he saw the object, by placing thereon a rectangular mark. It is vigorously contended by appellant's counsel that the object was the boy; and that, due to the weeds in the ditch, Warsing could not have seen him if he had been watchful; and that the boy climbed up on the shoulder and walked or ran into the rear of the truck as it passed. But there is considerable evidence which would have warranted the jury in finding that the boy could not have come in contact with the truck at that point but had already received his injuries nearly one hundred feet before the truck reached the point where its driver testified that the "dark object" came out of the weeds in the ditch; and furthermore, there is believable evidence in the record that the weeds in the ditch and on the shoulder were not tall enough to prevent a small child from being seen by a watchful driver.

In support of the theory that the boy was not injured at or near the point marked by Warsing on exhibit No. 1, it may be noted that evidence was given by patrol officer Frye, and by Warsing himself, that, two days after the accident, they, working together, attempted to locate the point where the boy came in contact with the truck. Officer Frye testified that he and Warsing found a brown stain on the highway

which seemed to be blood. At the request of counsel, he marked the spot on exhibit No. 1. They came to the conclusion, which may or may not be correct, that that was the point where the boy landed after coming in contact with the truck.

If the conclusion reached by driver Warsing and officer Frye, that the blood stain marked the place where the boy landed after coming in contact with the truck, is correct, the dark object which Warsing testified he saw coming out of the weeds in the ditch was certainly not the boy. For the blood stain was about one hundred feet east of the place where Warsing testified he saw the dark object coming out of the drain ditch, and the evidence shows that, at the time Warsing saw, or thought he saw, the dark object coming out of the weeds, the boy was lying unconscious and bleeding on the pavement near the northwest corner of the intersection, just a few feet west of the west line of Franklin avenue.

In our opinion, the evidence fairly well establishes that that was the place where the boy was struck by some part of the van of the truck, what part we cannot determine. However, a hole was punched through his skull from a half to three-quarters of an inch in diameter. We are strongly inclined to believe that some part of the truck, or probably something about three-quarters of an inch in diameter, protruding from its van, struck the boy on his forehead just as the vehicle cleared the intersection.

As we have hitherto shown, by quotations from the evidence, Walker saw Mrs. Nagala standing on the street near the bus stop, and saw her step back on the south shoulder to permit him to make his turn. We now quote certain portions of her testimony which tend to support the conclusion that the accident occurred adjacent to the west boundary line of the intersection:

"Q. Did you see a truck coming from the east at this time? A. After Mr. Walker passed? Q. Yes. A. Yes, sir. Q. Yes, when you were out on the pavement. A. Yes, sir. Q. How far away was this truck when you first saw it? A. Oh, that would be hard for me to say; about a hundred to a hundred fifty feet. . . . Q. Now, then, after you saw this truck

approaching from the east, going west, what did you do with reference to the little boy? A. You mean after he had been hit? Q. No, this is before. A. I had just stepped out there and was telling him and calling to him, trying to draw his attention. He never did hear me because he was still watching west, and I was trying to attract his attention and tell him to stay where he was, trying to get him to notice the other truck. . . . Q. Now, then, what happened after that? A. Well, after the other truck got past, I saw my boy laying there, and I picked him up. Q. What other truck are you speaking of now? A. Well, the truck that hit him. Q. The truck coming from the east? A. Yes, sir. Q. Now, what did it do? A. Well, I just couldn't say. As I say, I was watching my boy, and I just know that it passed on and my boy was laying there. Q. Now, then, as this truck approached from the east, which we will call the Yakima Grocery truck for identification, as the Yakima Grocery truck was approaching, did you notice whether it slowed down or speeded up or continued at the same rate of speed? A. It continued about at the same rate of speed it had approached. Q. Did you hear the Yakima Grocery truck sound a horn? A. No, sir. Q. Now, then, you have testified that the Yakima Grocery truck passed the spot where your little boy was, and after the truck passed, you saw your little boy. A. Yes, sir. Q. Where was your little boy lying? A. Well, he was laying about the same place he was standing at the —before, just about the same place, about halfway between the mailbox and the corner. Q. Was he on the pavement? A. Yes, sir. Q. Now, would you locate where your little boy was lying immediately after the Yakima Grocery truck passed the spot? A. (After assuming position near Exhibit 1) He must have been laying right along here (indicating). Q. Now, with reference to that brown spot put on there by Mr. Frye, where would it be, east or west of that spot? A. The brown—I don't understand. Q. Well, Mr. Frye placed this spot here (indicating), that's about two feet south of the north edge of the pavement, and he has a line here marked 21 feet 4 inches, from the mailbox to this spot. Now, where was your little boy with reference to that spot when you picked him up? A. He must have been right at that spot. Q. You feel that he was at that spot? A. Yes, sir. Q. Is that spot a correct positioning of your little boy as he lay there? A. Yes, sir, as near as I can remember. Q. Now, then, will you resume the stand. A. (The witness did so.) Q. How far from the north edge of the pavement was the

little boy lying? A. From the north edge? Q. Yes. A. Well, he must have been a foot from[e] the edge. I don't know whether he was that much or not. He was just right along the edge on the pavement. His whole body was on the pavement."

As stated early in this opinion, the evidence in this case does not show exactly how the accident occurred. However, we think it does show that it did not occur about one hundred feet west of the intersection, as contended by appellant, but just as the truck cleared the intersection.

The conditions, a few seconds before the accident occurred, were as follows: Walker was on the south side of the Power House road, on the west side of the intersection, driving east, intending to make a right turn at the intersection. He saw a woman (Mrs. Nagala) standing a little way out on the pavement, at a point which he would necessarily cross in making his turn. After he signalled that he was going to turn that corner and sounded his horn as a warning, she stepped back on the shoulder of the road, and he saw her standing there with a little girl with her. He also saw a little boy at the northwest corner of the intersection.

It appears from the testimony of Warsing himself that he was about fifty or sixty feet from the intersection at the time Walker was completing his turn, and that he did not see the boy or Mrs. Nagala or the little girl, and continued on his way and went through the intersection at a speed of about twenty-two or twenty-three miles an hour, which speed he had increased to about twenty-five miles an hour, when he got about one hundred feet west of the intersection, at which time he saw, "out of the corner of his eye, a dark object coming up out of the roadside ditch." At no time did he testify that the object was a boy. The attorneys assumed that it was, and they, therefore, frequently referred to it in their questions as "a boy" or "the boy." The same assumption was made in both their oral and written arguments in this court. But if the testimony we have quoted is believed, and the jury, of course, had the right to believe it, it cannot possibly have been the respondent. Mrs. Nagala testified that, just after the Walker truck made the turn, the grocery

truck went through the intersection on the north side of the road, and, just before it did, the boy was standing on the pavement at the north side of the road adjacent to the intersection. The truck passed, and the boy was lying on the pavement of the road. She was asked, speaking of the grocery truck: "Now, what did it do?" She answered: "Well, I just couldn't say. As I say, I was watching my boy, and I just know that it passed on and my boy was laying there." The details of the accident could not be found out by questioning the boy since he was unconscious when his mother picked him up and remained so for thirteen days. Nor could they have been furnished by Warsing since he did not see the boy either before or after the accident.

We see no reason to discount Mrs. Nagala's testimony, unless it would be on the theoretical ground of her interest in the outcome of the trial. Furthermore, her testimony is corroborated in a number of particulars by the testimony of other witnesses, and, moreover, her credibility was a matter for the members of the jury to determine. They had a first-class opportunity to judge as to that, since they saw and heard her give her testimony, and we have only the court stenographer's record of it.

We reject the appellant's contention that the evidence shows that the boy suddenly came out of the drain ditch about one hundred feet west of the intersection and ran into the van of the truck as it passed. In our opinion, the evidence strongly indicates that the impact occurred at the time, or just after, the grocery truck cleared the intersection. Exactly how, cannot be determined from the evidence. He may, as appellant speculates, have walked into the side of the truck as it passed, or he may have become dizzy and stumbled and butted his head against the van of the truck, or some part of it. About all we have to go on is that at one moment Mrs. Nagala, standing something like eighteen feet directly across the road from the boy, saw him standing on the edge of the pavement. Then the grocery truck passed, going east along the north side of the pavement, cutting off her view of the boy, and, when she next saw him, he was

lying unconscious on the pavement. Her testimony as to her position and the boy's position, at the time the truck passed, was corroborated by the testimony of Walker, the driver of the truck which approached from the west.

After picking up her boy, Mrs. Nagala, carrying him in her arms, ran screaming west along the road, with the intent of getting to a telephone to call the family doctor. The occupants of a passing car, seeing her carrying the blood-stained boy, stopped and offered assistance, and, when they understood the situation, kindly took her and her burden to the Yakima hospital, and she at once called Dr. A. J. Myers. He had professionally known the boy since April, 1946, and had removed his tonsils and adenoids only a few weeks before the accident with which we are now concerned. He testified at the trial that, when he reached the hospital, the boy was unconscious, his face was covered with blood, and the blood was still oozing from the wound on his forehead, and that it was apparent, without the use of x-rays, that his skull was badly fractured. He at once took steps to clean and bandage the wound to guard against infection. Having done so, he, with Mrs. Nagala's approval and on account of the seriousness of the case, called in Dr. Thomas Angland for consultation. Upon his arrival, the two physicians removed the bandage which Dr. Myers had put on and carefully sterilized, and rebandaged the wound. By this time, in addition to blood and bone fragments, brain tissue had begun to exude through the hole in the boy's forehead. X-rays were taken that night, and the results thereof were admitted in evidence in the trial and carefully explained to the jury.

In support of appellant's alternative motions for judgment notwithstanding the verdict or for a new trial, contention was made in the trial court, and is renewed in this court, that there was no evidence in the case which would support a verdict in favor of the respondent. We think the trial judge successfully answered that contention in his memorandum opinion denying the motions, and will, therefore, quote a considerable portion of the memorandum:

"It is clear from the testimony that the jury could properly find that the mother and also the boy were in plain view of

the defendant and that he could have seen the situation of the child if he had been vigilant. . . .

"Manifestly, in passing upon motion for judgment notwithstanding the verdict, no element of discretion is present and the motion must be denied unless the court can say as a matter of law that there is no evidence, nor inference therefrom, sufficient to uphold the verdict, and the evidence must be viewed in a light most favorable to the parties against whom the motion is made and all material evidence favorable to them must be taken as true. Children of tender years are favored by the law. They have equal right with motorists to use the streets and highways for legitimate purposes and a person operating a motor vehicle along the streets and highways is bound to recognize the fact that children will be encountered in the roadway; and it is the law that a motorist is bound to exercise ordinary care to avoid injury to children, and this care is commensurate with the danger and probability of injury, and the danger of injury to a child being greater than to an adult, the driver of an automobile is often liable for injuries to a child, when the circumstances of the accident, if the injury had resulted to an adult, might not justify a verdict against the driver. In other words, the conduct of children is not judged by the same rules which govern that of adults. Children of tender years are entitled to a degree of care from others proportioned to their inability to foresee and avoid the perils which they may encounter. Children must be expected to act upon childish instincts and impulses, and others are chargeable with a duty of care and caution toward them, and must calculate upon this, and take precaution accordingly. See Huddy, Ninth Edition, Cyc. of Automobile Law, Volumes 5 and 6, page 57. Also Hinckel v. Steigers, 130 Wash. Dec. 157; Sakshaug v. Barber, 23 Wash. 2d, 628; and Lee v. Independent Dairy, 127 Wash. 622.

"In the last case the court said that the driver of a vehicle of any kind is bound to anticipate the presence of children upon the public highway and to exercise reasonable diligence to avoid injuring them. In so doing, he is not justified in assuming that a young child will manifest the judgment and prudence of an experienced man, and must govern his own conduct with some reasonable degree of respect of that fact.

"In the case of Forrest v. Turlay, (Ore.) 266 Pac. 229, the court used the following apt language with reference to the duty of a motorist toward children:

" 'It is a well known fact that children often use streets to a certain extent for purposes of play. . . . He must be on the alert and keep his car under control. It will not do to drive on the assumption that a child will exercise the care to be expected of a person of mature judgment and experience. It is better to proceed on the theory that you never can tell which way a boy will jump.'

"In the case of Hornbuckle v. McCarty, 243 S. W. 327, the court held that the evidence created a jury question of the driver's negligence where a boy, oblivious of his peril, ran into the side of a passing automobile and the driver, in the exercise of ordinary care, could have discovered the boy's peril in time to have avoided the collision, and that the driver's negligence was the proximate cause of the boy's death.

"In the case of Messer v. Gentry, 290 S. W. 1014, the court held that an automobile driver whose negligence placed his car where a four year old child ran against it, is liable for injuries to the child the same as if he had struck the child with the front of his automobile.

"In the case at bar, vigilance on the part of the defendant would have disclosed the presence of the child at the side of the highway and vigilance would have disclosed the mother in the highway. If he had seen the child, under the authorities heretofore referred to, he could not drive on the assumption that the child would exercise the care to be expected of a person of mature judgment and experience. It was his duty to observe the child and, having seen him, it was his duty to have appreciated a dangerous situation, and to have stopped, or at least turned, so as to avoid an accident."

In assignment No. 8, appellant assigns as error the giving of instruction No. 9. That instruction told the jury that the law of the state required all motor vehicles to be equipped with a suitable horn which should be sounded at any time when approaching a condition of danger or where, in the exercise of due care, warning should be made, and continued as follows:

"Therefore, if you find, by a preponderance of the evidence, that, in the exercise of due care, the defendant Warsing should have sounded the truck's horn, and did not do so, then, in that event, said defendant was guilty of negligence, and if such negligence was the proximate cause, or

one of the proximate causes of said accident, your verdict should be in favor of the plaintiff and against both defendants."

The appellant took timely and due exception to the giving of that instruction, not on the ground that it did not correctly state the law, but on the ground that it was not applicable, in view of the evidence, or rather the lack of certain evidence in the case. In his brief, appellant contends that, in order to justify the giving of such instruction, it must appear from the evidence that there is a causal connection between the act of an omission and in the happening of the event giving rise to the cause of action, and that, if the horn had been sounded, the accident would probably not have happened.

Appellant, assuming that the respondent walked into the side of the truck, concerning which there is no probative evidence, says, in his brief:

"There is nothing in the record to indicate that if a horn had been sounded it would have affected the situation in any way or that the respondent would have been deterred from walking into the side of the passing truck at its rear."

to which the answer is that there was no evidence which would have warranted the jury in finding that he did so.

However, we think that, of appellant's ten assignments of error, assignment No. 8 has the greatest semblance of merit. As to this assignment, respondent cites and relies upon *Wickman v. Lundy*, 120 Wash. 69, 206 Pac. 842, *Lee v. Independent Dairy*, 127 Wash. 622, 221 Pac. 309, and *Pritchard v. Hockett*, 140 Wash. 499, 249 Pac. 989. While these cases are useful in considering some of the questions raised on the appeal, they are not very useful in considering appellant's assignment No. 8, since appellant's exception was grounded solely upon the contention that the instruction was not pertinent or applicable in view of the fact that the evidence in the case did not clearly establish how the accident occurred or indicate that it is likely or probable that it would not have occurred if the appellant had sounded a horn.

In this appeal, one of the principal contentions of the appellant is that the trial court erred in not granting his motion for a new trial, on several grounds therein stated and especially the following:

"3. Damages so excessive as unmistakably to indicate that the verdict must have been the result of passion or prejudice."

The appellant earnestly importunes this court to order a new trial of the case on that ground.

The complaint prayed for special damages, that is, with respect to expenses for hospital and medical services in the sum of $557.30, and for general damages, that is, for pain and suffering, permanent disability, and future medical care in the sum of thirty thousand dollars, or, in all, for a judgment of $30,557.30. The jury returned a verdict for $8,908.60 against the defendants and each of them.

It is admitted that respondent proved special damages in the sum of $608.60, and, presumably, that amount was included by the jury in their verdict of $8,908.60. That amount, less $608.60, is $8,300, which appears to be the amount the jury found with respect to respondent's pain and suffering, permanent disability, and for further medical care.

Our problem, then, is to determine whether that amount is so excessive as to indicate that the allowance of $8,300 for general damages "must have been the result of passion or prejudice." Clearly, the logical approach to the solution of that problem is to carefully consider the evidence given before the jury with respect to respondent's pain and suffering, permanent disability, if any, and whether he will probably require further medical attention.

Evidence is scarcely required to establish that one who has had a hole traumatically punched through his forehead, through which portions of his brain exuded, must have suffered pain at the time of the injury and thereafter. In the instant case, the boy was unconscious for thirteen days. However, there is evidence that he was in great pain during much of that time. His mother sat by his bedside all

of the time he was in the hospital, and it was her testimony that he would frequently cry out and try to pull the bandages from his head.

As to that matter, Dr. Myers testified as follows:

"Q. Now, then, while the child was in the hospital, you were in attendance quite often. Did the child cry out or give any indication outwardly to you that he might be suffering? A. Yes. There was that evidence spasmodically throughout the day. He would either double up and cry out or he would bring his head back as far as he could get it and cry out. That occurred frequently through the early parts of the case, and less frequently as we went on, but I would say in the first five to six days of unconsciousness he did that quite frequently."

Dr. Angland gave very similar testimony.

The boy's father also spent about eighteen hours a day at his son's bedside until he recovered consciousness on the thirteenth day. He testified as follows:

"Q. And did you observe the little boy cry out while you were in the room? A. Quite frequently. Q. What was the nature of his crying out? A. Well, just a shrill cry and contracting of his limbs, both lower and upper extremities, and clawing at the bandage on his head."

Because of the danger of infection, the doctors injected enormous quantities of penicillin, at the rate of fifty thousand units every three hours. Dr. Myers testified that, during the boy's stay in the hospital, more than two million, probably close to three million, units were injected.

We mention this as bearing on pain and suffering, not on account of the effects of penicillin, but on account of the rugged methods customarily employed in administering it.

Dr. Myers testified that, when the boy was hospitalized, he developed an inability to breathe, stating, in that connection:

"It wasn't from any obstruction in the lungs; it was just that the nerve centers which prompt the act in respiration seemed to have been pretty well dulled by the blow, by the concussion. There were two occasions, one lasting about forty-five minutes and another about half an hour, in which I administered artificial respiration, with oxygen and carbon dioxide administered, in order to try to keep him alive."

The remaining items of general damages, for which recovery was prayed for in the complaint, were "permanent disability and future medical expenses." These items are so interrelated that we will discuss them together.

While there is no explicit evidence that the respondent will be permanently disabled, there is evidence to the effect that there may have been permanent damage done to the base of the boy's brain which will require further treatment of some kind, and that it is possible, and indeed probable, that an operation, or operations, will be required to guard against epilepsy, and further evidence that the respondent will require an eye operation which, including hospitalization, will cost at least three hundred dollars.

Dr. Myers and Dr. Angland, in their examination of the boy, discovered a divergence of his eyes and that the pupil of one was greatly dilated. About a week after the boy's injury, they called in an oculist, Dr. James Thompson, who first examined the boy on June 10th. He testified that he found a divergence of the boy's right eye of thirty degrees, slightly reduced vision in that eye, and a very dilated pupil. By equipping the boy with specially designed glasses, and by other means, Dr. Thompson was able to partially correct some of the above-mentioned aberrations. By the end of July, the boy's vision was equal, and the thirty degrees of squint had been reduced to twenty. At the time of the trial, Dr. Thompson expressed the opinion that no further improvement as to the divergence could be had other than by an operation which would require hospitalization and an over-all expenditure of about three hundred dollars, and added that the enlarged pupil could not be corrected by surgery. He further expressed the opinion that, after the operation for divergence, the respondent would necessarily be required to wear glasses to keep his eyes in proper alignment.

When Dr. Angland was asked for his opinion as to whether there was a possibility that scar tissue would form over the injured part of the boy's brain, he testified, in part, as follows:

"A. Well, it would be rare if it didn't form. Wherever there is an injury, scar tissue, as a rule, follows in the act of healing. Q. Now, then, if that scar tissue forms over one of the motor control centers of the brain, what would be the likely result? A. Well, the likely result in the case would be what is known as traumatic epilepsy. It is a form of epilepsy as a result of an injury or trauma. Q. Is there a possibility or probability of a scar tissue forming over a motor control center of the brain? A. I would say this far after the accident, there is a chance; there is a chance. It doesn't appear to have happened, by anything that I have observed, but there is a chance of that, yes."

He further testified that traumatic epilepsy might set in several years after the accident. As hereinbefore noted, a portion of the boy's frontal brain exuded from the hole in his forehead. All three doctors who attended him were of the opinion that there were injuries at the base of the boy's brain. This they inferred from the eye damage. As to that matter, when asked whether the divergence of the eye indicated an injury to any part of the boy's brain, Dr. Angland replied:

"The nerves controlling the eye come from the base of the brain, that is, is the lower portion of the brain, so that it would indicate to me that there was, in addition to an injury to the side of the brain that we could see, also either a continuation of the same injury or at least some injury on the base of the brain."

The oculist, Dr. Thompson, gave a similar opinion. Dr. Myers agreed with his associates. All three agreed that that matter ought to be inquired into by a neurosurgeon. However, there being no neurosurgeon practicing in, or in the vicinity of, Yakima, they had Mrs. Nagala take the boy to Dr. Hale Haven, a neurosurgeon on the staff of the Virginia Mason hospital in Seattle. This she did. Dr. Haven was not a witness at the trial, and the jury was, therefore, not given any information as to what his conclusions were. All three doctors who attended the boy after his injury were of the opinion that the obviously very serious injuries to the frontal lobe of the brain were likely to bring on marked personality changes. Dr. Myers, who had been so very intimately

acquainted with the boy prior to the accident, was of the opinion that such changes were already manifest, and for that reason, and because of the indications that the base of the brain had also been injured, and because the boy has difficulty in coordinating the right side of his body, Dr. Myers testified that the respondent should have further expert medical observation, treatment, and direction. As to that matter, he testified somewhat more fully as follows:

"A. I would say he should have observation, both psychiatric and neurosurgically; from what we already know from other complications of health that would require attention, that would naturally be given. Q. Where would the child have to be taken to have psychopathic observation and treatment? A. Well, I would imagine Seattle would be the most available for the type of treatment you would want; I believe it could be provided there. Q. And, with reference to neurosurgery, where would he have to be taken for that? A. I would refer him back to Dr. Hale Haven for that, if I had charge of the case. Q. Your opinion is that that is going to be necessary in the future, to have that sort of treatment for the child? . . . A. It might be necessary. I see no evidence now, at this time, in my limited knowledge of such a highly specialized field, for anything other than observation, and I would like to see that done. I have recommended it continuously to the parents, that it would be a benefit from the standpoint of knowledge, and possibly balancing this child psychologically, and things we could learn which would help in assuring him a normal life pattern and avoiding things that shouldn't be done."

It seems clear to us that there was ample testimony elicited at the trial to warrant the jury to include in their verdict as to general damages a substantial allowance with respect to permanent injury and further medical care.

Eighty-three hundred dollars is a considerable amount of money, but, under the evidence in this case, can we say, as appellant asks us to do, that the jury verdict "*is so excessive as unmistakably to indicate that it must have been the result of passion and prejudice*"? We think not, for a number of reasons, the chief reason, of course, being the extremely serious nature of the respondent's injuries.

As held in *Crane v. Smith*, 23 Cal. (2d) 288, 144 P. (2d) 356, and reiterated in *Kircher v. Atchison, T. & S. F. R. Co.*, 32 Cal. (2d) 176, 187, 195 P. (2d) 427, an allowance of damages is primarily a factual matter, and it was said by a Federal judge in *Jones v. Atlantic Refining Co.*, 55 F. Supp. 17, 19:

"Courts in general are most reluctant to disturb a jury's verdict on the ground of excessiveness where the damages are unliquidated and there is no fixed measure of mathematical certainty. This is particularly significant with respect to damages in tort actions for personal injuries. *Armit v. Loveland*, 3 Cir., 115 F. 2d 308, 314."

That is particularly so where, as in this case, the verdict has been approved by the trial judge by refusing to grant a new trial on the ground that the verdict was excessive. *McClintock v. Allen*, 30 Wn. (2d) 272, 191 P. (2d) 679.

It is said, in the opinion of the United States circuit court of appeals of the fourth circuit in *Carter Coal Co. v. Nelson*, 91 F. (2d) 651, 654:

"The established rule in the federal appellate courts is that they have no power to review the action of a trial court in granting or denying a motion for a new trial for error of fact. Such a matter lies wholly within the discretion of the trial court and it is only when there is an abuse of such discretion that its action is reviewable."

It is said, in an opinion of the supreme court of the United States, written by the Honorable Oliver Wendell Holmes, in *Southern R. v. Bennett*, 233 U. S. 80, 87, 58 L. Ed. 860, 34 S. Ct. 587:

"But a case of mere excess upon the evidence is a matter to be dealt with by the trial court. It does not present a question for reexamination here upon a writ of error. *Lincoln v. Power*, 151 U. S. 436. *Herencia v. Guzman*, 219 U. S. 44, 45."

In the instant matter we are dealing with a claim of mere excess upon the evidence, which claim the trial court has rejected, and, as we have recently held in *McClintock v. Allen*, 30 Wn. (2d) 272, 191 P. (2d) 679, the ruling of a trial court on such a question will not be disturbed in the

absence of manifest abuse of discretion. We do not find any such abuse in this case.

In recent years, there has been a notable increase in the size of verdicts in personal injury cases. Verdicts approaching, and sometimes exceeding, two hundred thousand dollars are fairly common. It appears that the chief reason for the increase in the size of verdicts is not passion or prejudice, but the recent sharp decline of the purchasing power of the dollar. Measured by dollars, the earning capacity of most men has been increased; measured by its purchasing power, the value of the dollar has decreased.

We quote briefly from the opinion in *Kircher v. Atchison, T. & S. F. R. Co.*, 32 Cal. (2d) 176, 187, 195 P. (2d) 427, 434:

"It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [citing cases], and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered."

That statement is supported by the citation of many decisions. As early as 1925, this court said, in a case where a verdict was being challenged as being the result of passion or prejudice:

"The old cases are only of relative value because economical conditions today are not the same as they were ten or fifteen or more years ago. This has been frequently adverted to in our decisions, which it is unnecessary here to assemble." *Sherrill v. Olympic Ice Cream Co.*, 135 Wash. 99, 104, 237 Pac. 14.

While, as appellant suggests, it may be that some of the members of the jury deeply sympathized with the respondent, we call attention to the fact that, in the opinion last above cited, this court also said:

"When a verdict is challenged because it is claimed that it was excessive and was the result of passion and prejudice, we only inquire as to whether there was such passion and prejudice." (p. 103.)

We have so inquired, and a complete and careful examination of the trial record has not revealed any occurrence, or anything in the conduct of the respondent or the members of his family or their counsel during the trial, which could reasonably be thought likely to have aroused passion or prejudice. On the other hand, we find that the trial judge, in instructing the jury, went to unusual lengths to protect the defendants (appellants here) against the exercise of passion or prejudice. The trial judge gave comprehensive instructions as to damages, prefacing them with the following statement:

"The court does not know and is not permitted to theorize as to whether or not it will ever be necessary for you to consider the question of damages in this case, but I simply instruct you on that point for your information in case it becomes necessary for you to determine the question in your deliberations."

In instruction No. 16, the trial judge admonished the jury as follows:

"I instruct you that if you return a verdict for the plaintiff, then in the determination of the amount of the verdict returned you must not indulge in speculation or conjecture, nor should you be swayed by sympathy or prejudice. You must be guided wholly by the evidence and the law.

"The law only permits such damages to be given as will pecuniarily compensate a person for the injuries sustained by that person. Each party litigant is entitled to equal and exact justice at your hands and to a fair and dispassionate consideration of the entire case. Damages, if awarded, must be reasonable."

In his instruction No. 21, the trial judge further said:

". . . Jurors, as officers of the court, act judicially and disinterestedly, with an earnest desire to determine and declare the truth. In determining the facts, they should act impartially, without bias or prejudice, antipathy or pity."

We are convinced that the trial court did not err in refusing to grant the appellant a new trial, on the ground that the verdict was so excessive as "unmistakably to indicate that it must have been the result of passion or prejudice." It is, therefore, obvious that this court cannot grant

the appellant a new trial on that ground, nor do we know of any other ground upon which we could lawfully grant a new trial of the case.

Appellant also calls attention to the fact that the jury presumably included in its verdict the sum of $608.60, the amount which the boy's father expended with respect to medical services, hospital charges and nurses' fees, and the expense incurred in taking the boy to Seattle for examination by Dr. Haven. Appellant, then, makes the point that the boy's father was not the plaintiff in this case, but only appeared therein as the boy's guardian *ad litem*, and, this being true, contends that this action was brought in behalf of the minor only, and that, therefore, the expenses incurred by his father cannot be included in the award made to the plaintiff minor.

That contention may be disposed of somewhat summarily, since, under similar circumstances, that point was raised in an appeal to this court as early as 1904, in the case of *Donald v. Ballard,* 34 Wash. 576, 76 Pac. 80, and, in the opinion in that case, the contention was rejected, the court citing *Daly v. Everett Pulp & Paper Co.,* 31 Wash. 252, 71 Pac. 1014. See, also, *McAllister v. Saginaw Tbr. Co.,* 171 Wash. 448, 18 P. (2d) 41; decided in 1933. See, also, *Ball v. Pacific Coast R. Co.,* 182 Wash. 221, 46 P. (2d) 391, decided in 1935, in which the same contention was made as in this case and was held to be without merit, and rejected upon the authority of *Donald v. Ballard, supra.* We, accordingly, reject it in reviewing the instant case.

The judgment from which this appeal is taken will stand affirmed. It is so ordered.

MALLERY, HILL, and HAMLEY, JJ., concur.

SIMPSON, C. J., concurs in the result.