[No. 32709. Department Two. August 30, 1954.]

CHRISTIE LOU LAMOREAUX, a Minor, by Donald D. LaMoreaux, her Guardian ad Litem, et al., Appellants, v.
S. E. FOSKET et al., Respondents.[1]

[1]Reported in 273 P. (2d) 795.

McDowell & McDowell and Robert F. Murray, for appellants.

Hughes & Jeffers, for respondents.

SCHWELLENBACH, J.—Donald D. LaMoreaux, individually, and as guardian ad litem, commenced action against Reverend S. E. Fosket and wife, for damages sustained by his infant daughter, Christie Lou, when she was run over and injured by an automobile driven by Rev. Fosket. At the close of the testimony, the trial court, feeling that no negligence had been proved, directed a verdict in favor of defendants. This appeal follows.

A challenge to the sufficiency of the evidence, a motion for nonsuit, or a motion for a directed verdict, admits the truth of the plaintiff's evidence and all inferences rea-

sonably to be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant and in the light most favorable to the plaintiff. *Olsen v. White*, 37 Wn. (2d) 62, 221 P. (2d) 542. We shall be governed by the above rule in our approach to the problem involved in this appeal. Fortunately, we shall experience little difficulty because there is practically no dispute in the evidence.

The accident occurred August 26, 1950, at the home of Jess Neeley, located on Crawford street in Wenatchee. The house faced south. Attached to the house on the east was a garage, in front of which was an eight-foot driveway, which extended twenty-two feet eight inches to the street. Directly to the east of the garage was a small family orchard operated by Neeley. A clothes line was in the orchard hung between two apple trees. Between the driveway and the clothes line was a water ditch, which extended to a pump and water hole close to the street.

Rev. Fosket is the minister of the Free Methodist Church in Wenatchee. Mr. Neeley was one of his parishioners, and he had visited the Neeley home a number of times. Mr. Neeley's daughter, Alteene LaMoreaux, and her daughter, Christie Lou, had been with him for about eight months prior to the accident. Christie Lou, at the time of the accident, was eleven months old. She had been walking for two or three months and could walk fairly well. Rev. Fosket had visited on several occasions during the eight months that the child was there and had played with her although he had never seen her walk until the occasion in question. He testified that she walked very well for a year-old child; that she was quite steady on her feet. The mother testified that the defendant had never particularly made over the child; that there was no particular adoration on her part for him.

On the day of the accident, Rev. Fosket drove up to the house to see Mr. Neeley. The LaMoreaux car was parked in the driveway. Mr. Neeley's truck was parked in front of the house at the extreme west of the property line. Rev.

Fosket drove up back of the truck and parked his car, headed westerly. He got out and went into the yard looking for Mr. Neeley, who was not there. He found Mrs. La-Moreaux hanging clothes on the clothes line east of the garage. Christie Lou was there, walking back and forth between the garage and the clothes line. He talked to Mrs. LaMoreaux for about ten minutes and then walked back to the street around the rear of his car, got into the driver's seat on the left hand side and proceeded to back his car. When he had backed up about a car length, he felt a bump, stopped, looked out and saw Christie Lou lying in front of his left front wheel. She was seriously injured. He testified:

"A. I was—I called at the home to see Mr. Neely. He was not home and his daughter, Mrs. LaMoreaux, was at the east side of the house hanging up clothes, with the child playing beside her. And I went to ask or inquire where her father was and visited with her a few minutes, and when I turned—when I was through, I turned and went to the car and the baby was there with its mother, and went around the car, following not the path that is shown on this, but the one that is on this other diagram which you just had, on the east side of the car, around behind the car parked there, out into the street on the left hand side of my car, and backed out with the front wheels turning toward the little fence. I had looked up and down the street—it was a county road—and there were no cars present, and I was backing out into the street in order to avoid the little ditch and water hole and pump that was not too far behind my car. And in backing up, when I'd backed a short distance—less than the distance of the car, about that—I noticed this bump and opened the door and looked out in front and Christie was lying in front of my left front wheel. . . ."

"Q. You may take the stand again. Approximately how long did this conversation last? A. Approximately five minutes, five to ten minutes. I couldn't say for sure about that. Q. Did you notice the child during the time you were conversing with Mrs. LaMoreaux? A. Yes, I did. Q. Where was the child? A. Playing between the house and us, along back and forth, and just running back and forth there, playing there by the house. Q. By 'running back and forth' will you indicate what you mean by that? A. Well, it wasn't standing still. It was moving around, out by its mother and

back over to the house. Well, just moving around there in the immediate vicinity of where we were. Q. Could you tell what direction it took in its play? A. I should say she took about all directions because she didn't go far in any one direction or go any one place. It was more or less north and south along the side of the house. Q. And could you tell how far she would go in her play? A. No, I don't know that. Q. How far away from you two adults? A. I don't know that I paid any attention to that. Q. Well, would she go out and come back? A. Yes. Q. You couldn't tell just how far she might have gone away from you two at that time? A. No. Q. Could you tell whether she would go as far as the front of the garage? A. No, not for sure, I couldn't. Q. What was said when you took your leave? A. I don't know unless it was good bye or see you again or something of that kind. Q. Do you remember just how you took your leave? A. Just simply turned around and left immediately and went toward the car. Q. You ended the conversation and left? A. Yes, I did not turn around and talk to her again after I left. Q. Did you notice where the baby was when you left? A. No, I did not. Q. Could you place the position of the child on this diagram when you left; did you notice her? A. No, I don't think I could."

Mr. Neeley, who was not present during the visit, drew a map which was introduced as exhibit 1. The map showed the course which Rev. Fosket took as going to the west of the LaMoreaux car, rather than to the east, as he had testified. It also showed the position of the car after the accident as having backed toward the driveway, rather than in the other direction into the street.

Mrs. LaMoreaux testified:

"Mr. Hughes: And isn't it also true that you were so shocked and excited that you didn't take any particular notice as to which way the back end of the car was twisted?

"The Witness: Well, I noticed the way his car was in there, naturally. You couldn't help but see it.

"Mr. Hughes: That's correct, but as to just exactly whether it was as this diagram indicates with the right rear wheel up in your father's driveway—

"The Witness: (interrupting) Well, I couldn't say for positive, no.

"Mr. Hughes: In other words, your testimony, as I understand, is that the car had backed up to pull out in the

street, but just what the exact position of it was, you are just not sure, are you?

"THE WITNESS: That's right. One other thing, you didn't actually follow the path Reverend Fosket took to get back to his car after he left you out at the clothes lines? [*sic*]

"THE WITNESS: He came this way.

"MR. HUGHES: I am asking if you actually followed him with your eyes when he walked out to his car?

"THE WITNESS: No, I didn't.

"MR. HUGHES: In fact you didn't pay any attention to him at the time he left you at the clothes line until after the car stopped?

"THE WITNESS: That is correct.

"MR. HUGHES: Then you don't know which side of your car he walked on?

"THE WITNESS: Well,

"MR. HUGHES: Answer 'Yes' or 'No'.

"THE WITNESS: No."

From the testimony of the only two eye witnesses, there is no dispute that Rev. Fosket walked to the east of the La-Moreaux car and that he backed his car toward the street, rather than toward the driveway.

As to the conversation with Rev. Fosket, Mrs. LaMoreaux testified:

"A. I was hanging clothes on the east side of the house and he came around on a social visit, inquiring about my folks, and he was there for about ten minutes, and he left. Q. Was your baby there at the time?. A. Yes, she was. Q. Where was she when he first came? A. She was just playing right around the side of the garage and where I was hanging clothes. Q. Do you know how far you were from the end of the driveway? A. Well, approximately 25 or 30 feet. Q. Were you back of the south edge of the house—it would be the south edge of the garage? A. Back of the south edge, yes. Q. When Reverend Fosket came, where was Christie? A. She was right there with me. Q. Was she able to walk at that time? A. Yes, she was. Q. Could she walk well or with difficulty? A. Quite well. Q. Could she walk very fast? A. Well, yes. With children it seems like they always do. Q. Could she run? A. Yes. Q. She was how old at that time? A. Just three days before her first birthday. Q. And how long had she been walking? A. About two or three months. Q. You think Reverend Fosket was there about ten minutes? A. Yes. Q. And were you talking; was

he talking to you and you to him in conversation during that time? A. Yes. Q. And what did Christie do during this ten minute period? A. Well, Q. As near as you can remember? A. She was just right around there playing. Q. Did he talk to her? A. Yes, he went up to her. I don't know what he said, but he noticed her. Q. Did he pick her up or anything? A. No. Q. Just talked to her? A. Yes. Q. When he went to take his leave, what was said between you, if you recall? A. I don't know exactly what he said. He told me good bye and left. Q. And what were you doing at the time he left? A. Well, I was hanging clothes, I believe. Q. Do you recall whether you hung any clothes during this conversation? A. No, I don't remember. Q. Do you remember watching him leave? A. Well, I don't know as I watched him. I don't think I did. Q. Do you know what you did immediately after he left? A. Well, I noticed she was gone and I called and then I ran. Q. I mean just at the moment simultaneous with his leaving, do you recall anything you did or might have been doing? A. No. Q. What is the next thing you recall? A. That I noticed she was missing and I called her and ran toward the car. Q. Do you know where she was at the time he started away? A. No, I don't."

In order to affirm the trial court, we must hold, as a matter of law, that respondent was not negligent; or, to put it another way, that there was no evidence upon which the jury could find negligence on his part.

The driver of an automobile is bound to exercise ordinary, reasonable, or due care towards a child in the operation of his car, taking into consideration the age, maturity, and intelligence of such child. "Ordinary care" means that degree of care which a man of ordinary prudence would exercise under the particular circumstances. He is not an insurer against injuries to children from the operation of the car.

Each case must be governed by its own peculiar facts. The test in each case is, did the defendant, realizing the proclivities of children, and in particular, the age, maturity, and intelligence of the child involved, act in a reasonably prudent manner under the circumstances? 5 Am. Jur. 607, Automobiles, § 185. The generally accepted rule is:

"If a driver has reason to anticipate that a child might be near his automobile, it is his duty to see that the way is clear before starting the vehicle into motion, but, if he has no reason to anticipate the presence of children near his car, negligence cannot be predicated on the mere fact that he started his machine, injuring the child." 2A Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) 440, § 1509.

Appellant relies primarily upon two cases, *Lee v. Independent Dairy*, 127 Wash. 622, 221 Pac. 309, and *Nagala v. Warsing*, 36 Wn. (2d) 615, 219 P. (2d) 603. In the *Lee* case, the driver of a milk truck parked in front of a residence. A number of children were playing on the lots, sidewalk, and parking strip near the truck. When the driver returned after delivering milk, he hurried back to the truck, looked under and around it, yelled, "Look out", climbed into the truck and started to back up without sounding his horn, and without further observation. He backed over a three-year-old boy, causing injuries which resulted in death. A jury awarded damages for wrongful death. In affirming the judgment, we approved the following instruction:

"That a child in the public street is not a trespasser. His right there is as sacred as his adult neighbor or the owner of the automobile. True, he is charged with the duty of exercising such care for his safety as a child of his years, experience and capacity may fairly be presumed to possess, but the driver of a vehicle of any kind is no less bound to anticipate the presence of children upon the public highway, and to exercise reasonable diligence to avoid injuring them. In so doing, he is not justified in assuming that a young child will manifest the judgment and prudence of an experienced man, and must govern his own conduct with some reasonable degree of respect of that fact."

In the *Nagala* case, a three-year-old boy was struck and injured by a truck on the highway. In affirming a judgment for damages, we quoted with approval the memorandum opinion of the trial judge:

"Manifestly, in passing upon motion for judgment notwithstanding the verdict, no element of discretion is present and the motion must be denied unless the court can say as a matter of law that there is no evidence, nor inference

therefrom, sufficient to uphold the verdict, and the evidence must be viewed in a light most favorable to the parties against whom the motion is made and all material evidence favorable to them must be taken as true. Children of tender years are favored by the law. They have equal right with motorists to use the streets and highways for legitimate purposes and a person operating a motor vehicle along the streets and highways is bound to recognize the fact that children will be encountered in the roadway; and it is the law that a motorist is bound to exercise ordinary care to avoid injury to children, and this care is commensurate with the danger and probability of injury, and the danger of injury to a child being greater than to an adult, the driver of an automobile is often liable for injuries to a child, when the circumstances of the accident, if the injury had resulted to an adult, might not justify a verdict against the driver. In other words, the conduct of children is not judged by the same rules which govern that of adults. Children of tender years are entitled to a degree of care from others proportioned to their inability to foresee and avoid the perils which they may encounter. Children must be expected to act upon childish instincts and impulses, and others are chargeable with a duty of care and caution toward them, and must calculate upon this, and take precaution accordingly. See Huddy, Ninth Edition, Cyc. of Automobile Law, Volumes 5 and 6, page 57. Also *Hinckel v. Steigers*, 130 Wash. Dec. 157 [30 Wn. (2d) 171]; *Sakshaug v. Barber*, 23 Wash. 2d, 628; and *Lee v. Independent Dairy*, 127 Wash. 622."

Respondent relies upon the cases of *Wooldridge v. Pacific Coast Coal Co.*, 22 Wn. (2d) 314, 155 P. (2d) 1001, and *Comer v. Travelers Ins. Co.*, 213 La. 176, 34 So. (2d) 511. In the *Wooldridge* case, the driver of an oil truck nineteen and one-quarter feet long, seven and one-half feet wide, and weighing about seven tons, was slowly backing up a rather steep hill, after delivering a load of oil. Before entering the cab of his truck, he looked back up the street and saw no one. All of the time that he was backing, he alternately leaned out of the open truck door on his left and looked to the rear and then looked in the rear view mirror. He did not sound his horn. As he was backing, he heard a child cry and then saw it lying in front of the right side of the

truck. In an action for personal injuries, the jury found for the defendant. Upon appeal, we affirmed, saying:

"In the case at bar, the child was two years old and about two and one-half feet in height. The child was not seen by anyone until subsequent to the accident. Weeds and grass were growing close up to the usable portion of the roadway. What the relative positions of the child and truck were when the child came into the roadway, is not disclosed by the evidence. There is no evidence to establish the fact whether the child walked or ran into collision with the truck, nor whether the rear, the side, or the front of the truck collided with the child."

The *Comer* case was an action by the parents of a seventeen-month-old child who was struck and fatally injured by the automobile driven by the child's uncle, Rev. Van M. Dykes. Rev. Dykes and his wife had been living with the Comers, and he was at the time engaged in moving some of his possessions to the new location to which he had been called. After loading some of his effects into the car, he went back into the kitchen for a cup of coffee. He then walked onto the front porch, accompanied by his daughter, Kathryn, who was over twenty-one years of age. The child followed them to the porch. He kissed the child goodbye and left her with his daughter. Just as he was about to start his car, his daughter moved toward the end of the porch and gave him some instructions concerning messages to friends in the new location. He then proceeded to back up and almost immediately felt a bump. He was shocked and stunned when he saw he had run over his niece. The child died shortly after arriving at the hospital. The district court dismissed an action for damages.

Upon appeal, it was the contention of appellant that Rev. Dykes was negligent in backing his automobile in the driveway, having just left his infant niece, who he knew was extremely fond of him and followed him about everywhere if unrestrained, without first assuring himself there was no one in the back of the backing car. The supreme court of Louisiana affirmed, saying,

". . . for under the circumstances, having last seen

the child on the porch with his daughter, an adult of responsible age, in a place of safety, Rev. Dykes was justified in assuming, as a reasonable man, that if the child's position was changed to a more perilous one, he would be warned by his daughter, and that since he had not been so warned it was safe for him to back up. Consequently, having no actual knowledge of the child's perilous position in the vicinity of his car, he used all of the care that could have been expected of an ordinarily prudent person."

Each of the above cases is distinguishable on its facts from the case at bar. We are here concerned with whether or not Rev. Fosket acted as a reasonable and prudent man under the facts of this particular case. We do not believe that, under the circumstances, it should have been necessary for him to have gotten down and looked under the car before starting to back up. He did testify that Christie Lou was nowhere around when he walked around the rear of the car to get in on the left side. We should not be influenced by the fact that Mrs. LaMoreaux testified that when he left the baby was running around in the area. We are concerned solely with what Rev. Fosket did and what he did not do. He did not notice where the baby was when he left. He did not remember looking for her when he left. It did not occur to him that she would follow him.

■ He walked approximately fifty feet to the car, apparently intent on picking his way between the LaMoreaux car and the ditch and water hole, with no thought whatsoever of Christie Lou. Should he, under the circumstances surrounding this particular occasion, have been on the lookout for the child? We know now that if he had done so, the accident would not have happened. But, should he have had reason to anticipate that such a thing might happen? During the time that he was talking to Mrs. LaMoreaux, the child was playing back and forth in the area between the garage and the clothes line. She was always in the immediate vicinity of her mother. Rev. Fosket had never particularly made over her. She had never shown any particular adoration for him. He had no reason to believe that she would follow him. He testified: "I just couldn't feature

the fact of a year old baby following me that fast and getting out to the car . . . if that is what she did, and evidently she did. I didn't have no occasion to think the baby would follow me." He had no actual knowledge of the child's position at or near his car. He had no reason to anticipate that she would be there. Under the facts and surrounding circumstances, he used all of the care that could have been expected of an ordinarily reasonable and prudent person. There was no evidence of negligence on his part that could have been considered by the jury.

■ Appellant contends that the matter should have been submitted to the jury because Mr. Neeley testified that the evening of the accident, at the hospital, Rev. Fosket stated that it was carelessness on his part in not being more careful in looking before he started the car, and that he made similar admissions on two other occasions. Naturally, Rev. Fosket was filled with remorse because he had run over the child. However, it is questionable whether such statement constituted an admission. In *Ludberg v. Barghoorn*, 73 Wash. 476, 131 Pac. 1165, we quoted Jones on Evidence, § 297, referring to this class of evidence:

"It is a familar rule that verbal admissions should be received with caution and subjected to careful scrutiny, as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by the omission or the changing of words, to convey a false impression of the language used."

■ Furthermore, evidence of verbal declarations of the adverse party, where there are no corroborating facts or circumstances, is not sufficient to sustain a verdict of a jury upon a vital issue. *Kennett v. Federici*, 200 Wash. 156, 93 P. (2d) 333; *Commercial Importing Co. v. Wear*, 180 Wash. 669, 41 P. (2d) 777; *Rushlight & Co. v. Johnson*, 18 Wn. (2d) 383, 139 P. (2d) 280.

The judgment is affirmed.

HILL, DONWORTH, and WEAVER, JJ., concur.

GRADY, C. J. (dissenting)—This is another of the many cases to be found in our reports in which we have made ref-

erence to the rule to be applied when a court considers the sufficiency of the evidence, a motion for a nonsuit, or a motion for a directed verdict, and then have proceeded to become a trier of fact or have approved the action of a trial court becoming such, and by such process have defeated the case of a plaintiff.

In those cases where drivers of motor vehicles are confronted with the fact of the presence of small children within the danger zone, the amount of care and foresight to be exercised in order to meet the standard imposed by law is very great, and it is only in exceptional cases that the court should say that as a matter of law the standard has been met. The adjudicated cases so differ in their factual situations that they are not helpful aid in other cases except as they pronounce legal principles concerning the duty to anticipate or foresee what a child might probably do when near a motor vehicle.

In this case there arose a question of fact for the jury to determine whether respondent was or should have been aware of the presence of the child in such close proximity to the standing automobile that at any moment she might get into a place of danger upon the starting of such vehicle to move; and it also became a question for the jury to determine whether, with such knowledge, respondent acted as a reasonably careful and prudent driver should have done under the circumstances. Even though it may be said the testimony is not in substantial dispute, the jurors were not required to believe all that respondent said as to what he thought or believed to have been the movements of the child, or all of the word picture he portrayed when reconstructing the scene and events leading up to the accident. The physical facts coupled with the verbal version of respondent and permissible inferences made a factual situation, and it will not do to justify the action of the trial court by saying that as a matter of law no act of negligence was proven. The arguments made in the majority opinion to support the conclusion that no negligence was proven could properly and possibly with much effect have been made to

the jury, but are not suitable in applying the rules by which a court approaches a challenge to the sufficiency of the evidence. This has been largely the trouble to be found in those cases I have referred to when the courts have stated the rules cited in previous cases and then by an argumentative process found the facts to be such that a conclusion of negligence would not be warranted.

The judgment should be reversed and the case remanded for a new trial.

October 15, 1954. Petition for rehearing denied.

