[L. A. No. 20357.   In Bank.   July 1, 1948.]

KENNETH E. KIRCHER, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

Robert W. Walker, William F. Brooks and Wallace L. Ware for Appellant.

Max Fink, Jerry Rolston, Cyrus Levinthal and Leon E. Kent for Respondent.

CARTER, J.—Defendant railway company appeals from a judgment in favor of plaintiff in the sum of $60,000 for damages for physical injuries sustained by plaintiff at defendant's railway station in Santa Ana, California.

The accident occurred in the early morning of November 14, 1943, when plaintiff's left hand was run over and practically severed by defendant's train No. 70.

Defendant's depot consisted of a row of buildings, including an inside and outside waiting room, which ran in a northerly and southerly direction. East of the row of buildings and parallel thereto were five of defendant's railroad tracks lying about 15 feet apart. The ground immediately east of the depot was paved with asphalt, and two of the tracks referred to ran through this pavement, flush with the surface. Three or 4 feet beyond the easterly rail of these tracks the asphalt ended and

was adjoined by a brick pavement 9 feet wide (which was referred to by the witnesses as a "platform" or "walk." Two feet east of the brick pavement was the westerly rail of the main line track, on which train No. 70 travelled. There was no pavement east of the main line track, and the other tracks paralleling it farther east projected above the ties about 7 inches. Passengers were not permitted to enter or leave trains on the east side of the main line track, the brick pavement on the westerly side being used for that purpose. A few feet farther east of the five tracks just described there was a small private park maintained by the defendant railway company.

On the day prior to the accident, plaintiff, a young aviation cadet, stationed at an air base near Santa Ana, went to Los Angeles with his fellow-cadet, Harper. While there they encountered another cadet from the same air base, and the three young men shopped about the city and dined together that night. They separated about 9 o'clock, and plaintiff returned to Santa Ana on the Pacific Electric Railway, arriving there about 12:15 a. m., on November 14th. He went to the defendant's depot a few blocks away to await the return of the other two cadets, who he believed might return that night on defendant's train No. 70, which was due to arrive about 2 a. m. It was plaintiff's intention to share a taxicab with these friends in returning to the air base a few miles away.

After arriving at the depot plaintiff left a handbag and parcel with the attendant at the check room. He then walked about the station premises, passing over to the private park across a sidewalk at an intersection several feet to the north, thereafter recrossing to the depot where he was standing when train No. 70 came in. The train arrived from the north and was comprised of about 11 coaches. According to plaintiff, when it stopped he and several other persons walked easterly across the brick pavement toward the head coach, from which persons alighted at Santa Ana. Failing to find his friends in that car he proceeded to look for them in the remaining coaches. To do this he "jogged" or "trotted" northerly along the west side of the train, looking in the coach windows as he proceeded. He testified that while so doing his left foot went into a hole or depression in the pavement (described as being 2 or 3 feet wide and several inches deep). This caused him to stumble forward and hit his head against something blunt, which he believed was the side of one of the coaches. The blow rendered him unconscious, or substantially so, and he testified

that he must have then rolled under the coach, where he remained until the train pulled out (which was about 10 minutes later). As it was leaving, one of the train crew in the rear of the last coach heard calls for help, and looking out he saw plaintiff in the middle of the main line tracks signalling for assistance. Plaintiff's hand was found to have been practically severed, and it was amputated shortly thereafter.

Three of defendant's employees and a policeman testified that after the accident they found blood and particles of flesh on the easterly rail of the main line track. One of the employees and the policeman testified to having found a long fresh "scuff" mark about an inch deep, beginning near the place on the rail where the blood was found.

There were no eye-witnesses to the accident, and there are conflicts in the evidence and inferences arising therefrom as to the manner in which plaintiff may have sustained his injuries.

As grounds of appeal defendant urges (a) insufficiency of the evidence to support the judgment; (b) contributory negligence on the part of plaintiff; (c) plaintiff was a mere licensee, and the evidence did not show active negligence of the defendant, nor did it show that defendant was negligent in the maintenance of its premises; (d) a new trial should have been granted on the ground of newly discovered evidence; and (e) the award of damages was excessive.

Under the first point urged defendant contends that the only reasonable explanation of the accident is that when plaintiff went to defendant's park he did not recross to the westerly side of the main line tracks but remained there until the train was about to pull out; that at that time he ran toward it, tripped over one of the rails projecting from the ties, making the "scuff" mark by the toe of his shoe, thence falling near the easterly rail of the main line track so that his left hand came to rest on that rail where the particles of flesh and blood were found. Although this explanation of the accident as offered by the defendant would not be outside the realm of reason, it was not the version given by plaintiff nor the one adopted by the jury, which was the sole judge of the facts. In rejecting this theory the jury had before it positive statements by plaintiff that he merely walked through the park, remained in it a short time, thereafter recrossing to the west side of the brick platform, and that he "recalled dis-

tinctly'' that he fell on the station platform ''between the train and the station.''

In furtherance of the claim that the evidence was insufficient to support the verdict, defendant points out that after the accident and prior to trial plaintiff made the statement that he had stumbled against a rock, and it is urged that there was no showing that a hole such as plaintiff described at the trial was in existence at the time of the accident. It is also urged that plaintiff's version of the accident is contrary to the physical facts in that the distance between the hole referred to and a coach standing on the main line track would have been 13 feet—a distance too far for plaintiff to have stumbled in the manner described; and that since the particles of flesh and blood on the east rail of the main line track indicated that the accident had occurred at that point, which apparently was some feet north of the hole on the west side of the track, it would have been physically impossible for plaintiff to have fallen on the west side of the train so that his *left* wrist rested on the *east* rail. Finally, defendant urges, equipment attached beneath the coaches would have rendered it impossible for plaintiff's body to have remained under the train without having been crushed by its movement.

The fact that previous to the trial plaintiff may have stated that he thought he had stumbled over a rock would not necessarily be binding on the jury in the light of other circumstances shown by the record. In a written statement prepared by defendant's claim adjuster based on questions propounded two weeks after the accident, and while he was still in the hospital, plaintiff made such an assertion, but the entire document shows that he was not making it as a positive statement. So far as pertinent here the document reads: ''The platform was not very well lighted and I had passed several cars when my foot caught against a rock or some other object, causing me to lose my balance and fall. I had been around over most of the station platform while waiting for train and I did not at that time notice any rocks or other objects on it to cause a person to stumble or fall, and *I do not know what it was that I stumbled over.*'' Plaintiff's assertion that his foot ''caught against a rock or some other object'' must be read in the light of the statement that he had not noticed any rocks or other objects and he did not know what he had stumbled over. Moreover, the record shows that throughout the trial and on appeal plaintiff contended that he stepped into a hole

with his left foot and that this was what caused him to stumble. His evidence included photographs taken some four weeks after the accident, which showed a large hole about 2 feet square in the asphalt pavement immediately west of the brick walk and about 13 feet west of a coach standing on the main line track. This is the hole plaintiff claims he stepped into. ing from 2 to 4 inches deep, and places where the pavement The photographs also showed several smaller holes in the paved portion of the depot grounds east of the station rang- who resided in Santa Ana and who testified he had frequently had been patched. The pictures were taken by a photographer been at defendant's depot, was familiar with its surroundings and that the photographs correctly reflected the general condition of the railroad station grounds during November, 1943.

Evidence given by plaintiff in substantiation of his theory of the happening of the accident includes the following: In response to a query as to how close he was to the train while trotting along, plaintiff (who was 5 feet, 4½ inches tall) replied, "Well, I was far enough away from the train so I could look in the windows, being short as I am, I couldn't look in the windows if I were close . . . I recall that . . . as one of my feet hit the ground, I felt it going down and it was a hole that caused me to fall. Q. A hole? A. A hole or depression—a hole." He further stated, "A. After I fell, I pitched forward and in trying to regain my footing, I stumbled — I don't know how far a distance, and in trying to right myself, I had forward speed there—and hit my head on some object and that is the last I know until I was picked up. Q. So, that after stepping into this hole and being on the run, your momentum was such that it threw you forward and was that the way you fell? A. Well—yes, I fell in a pitched position, you might say. I struck something in a pitched position, would be more correct. Q. Head first? A. That is right . . . I don't recall exactly what I did after I hit my head." Plaintiff was then asked whether he saw the hole, and replied, "No, sir, or else I wouldn't have stepped into it. . . . I mean I wouldn't have purposely done that. Q. Now, this hole I take it, was in the [brick] platform was it? A. I don't think it was in the platform itself,—not what you would call the platform, it was a little off of the platform, you might say . . . I don't know how wide those platforms are, but I had to step back in order to see in those windows and in doing so, probably overran the paltform edge. . . . Q. Do you believe that

you got over on the asphalt paving portion off the brick platform? A. Yes, sir, I must have.''

Plaintiff's attention was called to the fact that while he claimed he fell under the train on the west side of the main line track the evidence indicated that his left hand was run over on the easterly rail of that track. He was then asked: ''Do you have any way of accounting for that? A. None other than as I said, that I was in my subconscious state of mind and trying to get out from under the train knowing that there was some danger there, I crawled in the opposite direction. Q. Well, by that, do you mean that you might have crawled after having fallen under the train to the opposite side of the train? A. That is right, yes, sir. Q. You are sure you weren't on that track when the train pulled in? A. Oh, no, sir, I was on the station—right there—I wasn't on the track. . . . Q. After you had struck your head against the object that rendered you unconscious did you have a sensation or realization that the train was later traveling out or over you? A. No, sir; I just recall trying to avoid a danger that I knew the train presented. Q. I see. That is, while you were in that subconscious, or semi-conscious state, you had a sensation of being in danger and trying to crawl from under the train, is that right? A. That is right, yes, sir. . . . Q. You had a sensation of crawling under the train trying to reach safety, is that right? A. Yes, sir . . .''

There was nothing to show that the ''scuff'' mark described by the two witnesses was made by plaintiff. Moreover, these witnesses gave varying descriptions of the mark. One of them testified that it ran in an easterly direction and was ''approximately 16 to 18 inches long . . . perhaps an inch or an inch and a half wide.'' Asked to state the location of the mark with reference to the blood stains on the rail he replied, ''It would be approximately due east of the blood stains . . . Q. For what distance from the rail? A. I don't recall exactly, I would say it was a matter of two or three feet.'' The other witness, defendant's employee, stated that the mark was only a few inches east of the rail and that it ran *southward*, for approximately 3 feet. He was asked, ''Could you tell from the mark itself whether it started from an easterly direction. A. Well, it appeared to start from a northerly direction. Q. And its course was——? A. South . . . as far as I remember, almost parallel with the track.''

There were other conflicts in the evidence in addition to those heretofore referred to. One of these related to the

question whether the window shades of train No. 70 were drawn during the time the train remained in the station on the morning of November 14. Defendant adduced evidence to show that at the time in question it was subject to certain orders made by military authorities which necessitated the lowering of window shades in coaches of trains during the night-time, and that these rulings were obeyed. Other evidence indicated that some of defendant's train crews had not been diligent in enforcing these orders, and plaintiff repeatedly testified that on the morning of the accident the shades were up in the coaches and he looked in the windows and saw people standing and walking in the aisles.

The evidence was also conflicting on the question whether the equipment attached under the coaches of train No. 70 would have crushed plaintiff's body had it been under the train when it was moving. The witnesses gave varying estimates of the size and depth of this equipment. No useful purpose would be here served by detailing these estimates, and it is sufficient to say that one of defendant's employees testified that (except for the air hose connection) there was sufficient space underneath the coaches for a box 18 inches high and 4 feet, 7 inches long to lie between the rails. Another of defendant's employees testified that the lowest part of the air hose connection was approximately 14 inches above the ground. Plaintiff was of small stature and it was not shown that his body could not have rested in a prone position between the rails without having been crushed by the equipment while the train was in motion.

Under well-settled rules the several conflicts in the evidence were for the determination of the jury. This is likewise true as to the question of credibility of the witnesses (*Hicks* v. *Reis,* 21 Cal.2d 654, 658 [134 P.2d 788]; *Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868]), including plaintiff. Although an appellate court will not uphold a verdict or judgment based upon evidence inherently improbable (*People* v. *Huston,* 21 Cal.2d 690, 696 [134 P.2d 758]), the determination of questions of fact, and of the credibility of the witnesses is so largely a matter for the trial court that unless we can say that plaintiff's version of the accident was wholly unacceptable to reasonable minds, we cannot set aside the jury's implied acceptance of it. (See *Neilson* v. *Houle,* 200 Cal. 726, 729 [254 P. 891]; *Hughes* v. *Quackenbush,* 1 Cal. App.2d 349, 354-356 [37 P.2d 99]; *Austin* v. *Newton,* 46 Cal.

App. 493, 498 [189 P. 471]; *People* v. *Meyers,* 62 Cal.App.2d 24, 28 [144 P.2d 60].)

It is true, that as related by plaintiff, the manner in which the accident happened appears to have been most extraordinary. But as stated in *Neilson* v. *Houle, supra,* "Common experience and observation teach us that strange and astonishing things sometimes happen in the world of physical phenomena, and accidents sometimes appear to happen in manner unaccountable." In the light of all the circumstances of the present case it cannot be held as a matter of law, that plaintiff's version was such as to contravene the laws of nature, or as to render the jury's acceptance of it unreasonable. Plaintiff was a young athlete, trained in the control of the body, and it does not appear entirely unreasonable to us that he stumbled a distance of 13 feet while endeavoring to prevent his body from falling to the ground. Although he stated quite frankly that he was unable to explain with certainty the manner in which his left hand came to be placed on the east rail of the main line track, the jury had before it evidence indicating that on the night of the accident there was a hole .in the depot platform such as plaintiff asserted he stepped into precipitating his fall, and the ultimate fact that defendant's train ran over his hand at the time and place in question. In these circumstances the jury was not compelled to find against him because he could not with certainty relate the exact manner in which his left hand came to be on the east rail. It could reasonably have inferred that his failure to explain this circumstance was due to the fact that in the critical few minutes he was under the train he was unconscious, or substantially so, from the blow on his head as the outcome of stepping into the hole. As stated in *Neilson* v. *Houle, supra,* quoting from *Austin* v. *Newton, supra,* " 'It is not to be supposed that witnesses to an accident that happens in the twinkling of an eye should accurately observe all the details. Much less is it probable that one who is injured in the accident, and rendered unconscious, should be able to give a correct account of all the quickly happening events. It cannot be laid down as a rule of law that a plaintiff in a personal injury case cannot recover unless the court can see that *every detail* of the accident, as testified to by the plaintiff and his witnesses, is consistent with admitted physical facts and the laws of science . . .' " [Emphasis added.] In the light of the evidence here adduced the jury could rea-

sonably have concluded that plaintiff's hand had been placed on the east rail as he was attempting to crawl to safety while in a dazed or semiconscious condition, or that while he was unconscious and the train was in motion, some of the equipment had altered his position causing his left hand to rest on the east rail.

As to the claim of contributory negligence, under the circumstances of this case the fact that plaintiff was hurrying along the platform and looking in the windows of the coaches would not necessarily show a violation of his duty to exercise ordinary care for his own safety. As before noted, he stated that while he was waiting for the train to come in he had been over most of the station platform and had not noticed anything that would cause a person to stumble or fall. He further stated that after the train arrived he saw no objects in his path as he trotted along the platform; and that the general impression he received from looking at the floor of the platform was that it was "smooth," and "appeared level." And although there was evidence to the contrary, he also stated that the station was dimly lighted. He was in a place maintained by the defendant for travellers and other members of the public who might come to the station to meet incoming trains and was therefore entitled to assume that the area in question was maintained by defendant in a reasonably safe condition. Under all the circumstances, the question whether he should be held to have had knowledge of any holes in the pavement, or other unsafe condition, discoverable in the exercise of ordinary care, was a matter for the determination of the jury. (*DeGraf* v. *Anglo California Nat. Bank,* 14 Cal.2d 87, 98 [92 P.2d 899]; *Oles* v. *Kahn Bros.,* 81 Cal.App. 76, 81 [253 P. 158].)

Defendant's contention that plaintiff was only a licensee on its premises and hence defendant was at most only liable for active negligence cannot be upheld. It is claimed that plaintiff was a mere licensee because he was not on defendant's premises pursuant to any business with the defendant, nor was he occupying the status of one going to a railroad station to meet friends, because he had no assurance that his friends would return that night. However, the record shows that the two cadets whom plaintiff had been with in Los Angeles had been promised a room that night in a private home in Los Angeles providing they telephoned the owner before a certain time, which they had failed to do. Due to the fact

that in 1943, while the second world war was in progress, it was exceedingly difficult to secure hotel accommodations in the large coastal cities unless under prearrangement, the three young men had parted in Los Angeles with the tacit understanding that the other two cadets would return to Santa Ana that night. Although there are cases to the contrary, the weight of authority supports the rule that members of the public who go to a railway depot for the purpose of meeting persons arriving or departing on trains are business visitors, since it is a part of the business of a railway company to afford its passengers such conveniences. (*McCann v. Anchor Line,* (C.C.A.2d) 79 F.2d 338 ; *Louisville & N. R. Co. v. Richard,* 31 Ala.App. 197 [14 So.2d 561, 563] ; *Chesapeake & Ohio R. Co.* v. *Mathews,* 114 Va. 173 [76 S.E. 288] ; *Holdaway v. Lusk,* (Mo.App.) 194 S.W. 891; *Chicago etc. Ry. Co.* v. *Amedon,* 161 Ark. 310 [256 S.W. 52] ; see, also : *Jackson* v. *Hines,* 137 Md. 621 [113 A. 129, 131] ; *Sims* v. *Warren,* 248 Ala. 391 [27 So.2d 803] ; Rest., Torts, Com. d, § 332; 10 Am. Jur. p. 80; 13 C.J.S. 1351; 92 A.L.R. 615.) It follows from the foregoing that plaintiff was an invitee to whom defendant owed the duty of keeping its railway premises in a reasonably safe condition.

As to the claim that the award of damages was excessive, the evidence shows the following : at the time this accident occurred plaintiff was 23 years old. Prior to his entry into the army he had attended Jefferson College and Missouri University, studying to become a physical education instructor. He had worked as a recreation leader in the parks of St. Louis during summer vacations, instructing in swimming and playing ball. He had hoped to remain in the army if he succeeded in obtaining a sufficiently high rank. There was evidence before the jury indicating that plaintiff's choice of occupation without a left hand would be greatly restricted. After his injury he worked a few weeks for an engineering firm, where he was required to do drawing, receiving $45 a week. He found himself unable to do this work and later took a position as attendant at public tennis courts at $35 a week. Permanent impairment of earning capacity was therefore a prime factor in the award of damages. The jury was also entitled to take into consideration plaintiff's youth, background, and all other relevant circumstances (*Roedder* v. *Rowley,* 28 Cal.2d 820 [172 P.2d 353]), including the fact that his admission into the branch of military service into which he had been inducted,

indicated an excellent physical condition preceding the accident. An allowance of damages is primarily a factual matter (*Crane* v. *Smith*, 23 Cal.2d 288 [144 P.2d 356]), and it is well settled that even though the award may seem large to a reviewing court, it will not interfere unless the allowance is so grossly disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion and prejudice. (*Johnston* v. *Long*, 30 Cal.2d 54, 76 [181 P.2d 645].)

■ It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral (*Autry* v. *Republic Productions, Inc.*, 30 Cal.2d 144, 154 [180 P.2d 888]; *Nason* v. *Leth-Nissen*, 82 Cal.App.2d 70, 75 [185 P.2d 880]; *Freeman* v. *Nickerson*, 77 Cal.App.2d 40, 52 [174 P.2d 688]; *Estrada* v. *Orwitz*, 75 Cal.App.2d 54, 60 [170 P.2d 43]; *Butler* v. *Allen*, 73 Cal.App.2d 866, 870 [167 P.2d 488]), and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered.

We find nothing in the present record warranting an interference with the allowance, in the light of the rules referred to.

■ The granting or denial of a new trial on the ground of newly discovered evidence is a matter on which the trial court has a wide discretion. The alleged new evidence here sought to be shown consisted of hospital records, plaintiff's military record, and an affidavit by plaintiff setting forth the facts relating to the injury. The hospital records were sought to refute plaintiff's testimony that he suffered a blow on his head at the time of the accident. A counteraffidavit of plaintiff's counsel states that this record "does not purport to be a complete medical and hospital record of the care, treatment and injuries sustained by plaintiff"; and that the documents "do not tend to prove or show that plaintiff failed to receive a head injury, and in truth and in fact, [they] clearly show that at the time of the accident, plaintiff was rendered unconscious by reason of the injury." This affidavit further recites that the records sought to be shown "are merely cumulative and entirely consistent with testimony given at the trial." A motion for new trial on the ground here claimed is properly denied if it is shown that the newly discovered

evidence is to be used for impeachment purposes, or if it is merely cumulative. Unless there is a clear showing of an abuse of discretion the trial court's denial of the motion on the ground here urged will not be interfered with by an appellate court, particularly where counteraffidavits are filed. (*Ginn* v. *Podesta*, 8 Cal.2d 233, 237 [64 P.2d 1090] ; *Cooper* v. *Kellogg*, 2 Cal.2d 504, 512 [42 P.2d 59] ; *Waer* v. *Waer*, 189 Cal. 178, 181-182 [207 P. 891] ; *Atherley* v. *Market St. Ry. Co.*, 42 Cal.App.2d 354, 363 [108 P.2d 927].) We find no abuse of discretion in the trial court's ruling.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Schauer, J., and Spence, J., concurred.

SHENK, J.—I dissent.

I am convinced that the plaintiff's version of how the accident happened is contrary to the laws of nature and inherently improbable. To be expected to believe that the plaintiff could have stumbled over a shallow depression 13 feet from the westerly rail of the track and been pitched forward and under the train on that track so that his hand was crushed on the easterly rail and his body not injured while under the moving train, taxes credulity to the breaking point. On the other hand, there were reasonable inferences from sufficient credible evidence, some of it introduced by the plaintiff, that he proceeded from the park on the easterly side of the tracks as the train was moving in front of the station; that he tripped on a rail on the easterly side of the train where he had no right to be, and fell, whereupon his hand was caught on the easterly rail under the moving train. To my mind this was the only factual situation on which to base a conclusion and with no resulting liability on the defendant. It should lie uneasy on the conscience of a court to permit a jury's verdict to stand which must necessarily be based on the incredible theory of the facts advanced by the plaintiff.

Furthermore, I cannot agree with the conclusion that the jury's verdict of $60,000 is not so grossly disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice. In my opinion the size of the verdict, notwithstanding a deflated purchasing power of the dollar, and the youth and marital status of the plaintiff, is so dispropor-

tionate to the loss of a hand as to raise a presumption that it was the result of passion and prejudice.

TRAYNOR, J.—It is my opinion that although the accident as described by plaintiff is not outside the realm of possibility, his version, which is that of an interested and impeached witness, involves so extraordinary and improbable a sequence of events that without corroboration it does not warrant belief by a reasonable jury. I cannot agree, therefore, that a reasonable jury could find it more probable than not that plaintiff sustained his injury as a result of the defendant's negligence.

Appellant's petition for a rehearing was denied July 29, 1948. Shenk, J., and Traynor, J., voted for a rehearing.