[Civ. No. 21641. Second Dist., Div. Two. Sept. 26, 1956.]

MURIEL M. BROWN, Respondent, v. RALPH I. GUY, Appellant.

Carl Sturzenacker, De Forrest Home and Albert Hampton for Appellant.

Elmer Patrick Friel and Henry E. Kappler for Respondent.

ASHBURN, J.—Malpractice action against a doctor of chiropractic. Verdict for defendant. Plaintiff's motion for new trial was granted upon the ground of insufficiency of the evidence to support the verdict. Defendant appeals.

█ Upon the consideration of a motion for a new trial the court must make an independent appraisal of the evidence, including all presumptions and reasonable inferences, and must judicially determine whether the judgment effects a miscarriage of justice. █ In considering such motion the trial court is not bound by a conflict in the evidence but may be governed by any substantial proof that would reasonably warrant a judgment for the moving party even though such evidence consists of nothing more than inferences from established facts. █ On appeal from the order it will not be reversed unless the reviewing court concludes that as a matter of law there is no substantial evidence to support a contrary judgment. (*Edler* v. *Sepulveda Park Apts.*, 141 Cal.App.2d 675, 677 [297 P.2d 508]; *Estate of Green*, 25 Cal.2d 535, 542 [154 P.2d 692]; *Hames* v. *Rust*, 14 Cal.2d 119, 124 [92 P.2d 1010]; *Ballard* v. *Pacific Greyhound Lines*, 28 Cal.2d 357, 358, 359 [170 P.2d 465].)

The principal factual issue at the trial was whether defendant had injected into plaintiff's ischemic (blood-starved) right foot a quantity of ozone, and secondly whether that precipitated gangrene which ultimately caused amputation of the leg.

Appellant's counsel argue that the evidence was legally insufficient to support a verdict for plaintiff because her testimony was inherently improbable. █ To reach that conclusion it is necessary, however, to show "either a physical impossibility that they [the witness' statements] are true, or their falsity must be apparent without resorting to inferences or deductions." (*People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758].) Appellant's arguments, though somewhat persuasive, consist at best of a review of the inferences and deductions which counsel claim should be drawn from the evidence. Hence they cannot prevail. The evidence, viewed most favorably to plaintiff, affords sound basis for a verdict in her favor. █ The function of the appellate court begins and ends with a determination of whether that is the case; we do not review the weight of the evidence or the propriety of permissible inferences; if the cumulative effect of the proof, direct or indirect, contradicted or uncontradicted, whether produced by the one side or the other, is legally

sufficient to sustain a finding for plaintiff, the order must be sustained. (*Edler* v. *Sepulveda Park Apts., supra,* 141 Cal. App.2d 675, 677; *Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231].) The statement which follows is constructed on the basis of accepting the evidence most favorable to plaintiff.

For more than a year prior to September 13, 1953, plaintiff, then aged 55, suffered from a symptom pattern known as the Leriche Syndrome. This consisted of increasing amounts of pain in the lower back and through the hips which would come on after walking about a half block; after a short rest walking could be resumed and the pain would recur; her feet were unusually cold at night, requiring use of hot pads. There is only one condition that can cause that, namely, occlusion of the arterial circulation to the part where the muscle pain occurs; the pain is caused by lack of blood supply to the muscles. This evidence immediately takes the court into the field where expert testimony is essential and controlling. (*Moore* v. *Belt,* 34 Cal.2d 525, 529-530 [212 P.2d 509].) In the light of subsequent events the medical experts agreed that plaintiff had a partial occlusion in the saddle of the aorta, which impaired the blood supply to both lower extremities rendering them susceptible to spontaneous necrosis or gangrene; also to a precipitation of that condition by trauma or infection.

On said September 13th, plaintiff was seized with nausea and vomiting followed shortly by severe pain, chills and numbness in the right leg, mostly in the foot; there was tingling in the toes and the pain extended from foot to upper thigh; the foot felt like a block of wood. This acute episode pointed to a severe blockage of the right iliac artery and a less severe one in the left iliac. (The aorta bifurcates into the two iliac arteries which supply the blood to the respective limbs.) Being in much pain and unable to diagnose her own trouble, plaintiff invoked the aid of several doctors, chiropractic and osteopathic, who failed to diagnose her trouble and did little for her.

On November 3, 1953, being in great and constant pain, she went to see defendant, Dr. Guy, whom she had known for some years. She told him she had a steady and severe pain in her right leg and thought it was sciatica. He said she told him it was arthritis. He took no further history, made only a casual examination of the foot and leg, which then appeared to be normal, and made no diagnosis whatever.

Dr. Guy told plaintiff he would give her a shot of "polyzone," "a liquid oxygen." He had a polyzone machine present; it passes oxygen ($O_2$) over an electrical field and converts it into ozone ($O_3$), which is a gaseous oxidizing agent; when applied to tissues of a human body it has a burning effect. Ozone has been rejected by the medical profession and other scientists as a therapeutic agency because it is an irritant which causes injury to the tissues when used in concentrations sufficient to be effective; an injection of same would cause injury similar to a chemical burn; the gas would not be absorbed.

Defendant held plaintiff's foot with his left hand and with the right injected 28cc of ozone into the arch, or immediately beside it. He denies this, but plaintiff testified that he did so. Another witness, Mildred Bredesen, was present. She was then acting as practical nurse for plaintiff. Initially she gave plaintiff's attorneys a statement saying that defendant had made the injection in question. Later, after talking to him, she changed her story and testified, as defendant did, that he made no injection and merely sprayed the ozone on plaintiff's foot,—a procedure which defendant and all other witnesses agreed would do no good whatever. The trial judge, in performing his duty of independently weighing the evidence (*People* v. *Robarge*, 41 Cal.2d 628, 633 [262 P.2d 14]), concluded "that the implied finding of the jury that the defendant Ralph I. Guy did not administer injection by hypodermic needle into the tissues of the plaintiff's foot a substance called ozone is not supported by the evidence, and that the credible evidence is insufficient to support such a finding. . . . that the witness Mildred Bredesen was thoroughly impeached." ■ It is true, as argued by appellant's counsel, that there are phases of plaintiff's testimony upon this issue which cast doubt upon its verity, but the trial judge was authorized to accept part and reject part of the witness' version (*Murphy* v. *Ablow*, 123 Cal.App.2d 853, 858 [268 P.2d 80]), and the record is in such shape that we are bound on this appeal to accept the trial judge's finding. We therefore proceed upon the assumption that the injection was given as testified by plaintiff.

■ When that occurred she screamed with pain, and following the incident suffered severely and continuously. When she reached home the foot was swelling, the point of insertion of the needle was described by her as a hole with dark red around it and further surrounded by a blue-gray puffing.

The next morning the skin was wrinkled and mottled and the pain was "terrible."

On the 5th of November a friend brought Dr. Porter to see her and he gave an injection of novocain in that same area to relieve the pain. Soon after that, Dr. Shropshire, an osteopathic physician, was employed. He took a history which included injection of "polyzone" followed by an abscess, and he sent her to the Glendale Community Hospital. The abscess was incised and the underlying tissues were found to be "quite necrotic." Apparently there was no infection at that time, for a laboratory examination of tissue revealed it to be a "sterile abscess." It was Dr. Shropshire's opinion that the condition he found was the result of the injection of "polyzone" into the tissues. Plaintiff was in the hospital from November 16 to November 25, and then went home. She was still having pain in the right foot and leg and the foot continued to get worse. Plaintiff employed Dr. Craven in January, 1954, then Dr. Talmadge and finally, in February, sought the help of Dr. Lawrence W. Smith, an M.D. specializing in surgery and peripheral vascular diseases, a well-qualified expert.

He first saw plaintiff at St. Vincent's Hospital on February 19, 1954, took a history and made an examination which disclosed a large area of gangrene on the medial aspect of the right foot, at the site of defendant's injection. He was of the opinion that the basic existing condition was one of occlusion of the arteries to the extremities, and that the block was above the groin. His diagnosis was gangrene of the foot and "beginning possible gangrene in the right upper thigh" due to severe occlusion of the lower aorta. The sole basis for any gangrene is lack of blood supply to the affected area. It is an invariable rule that leg gangrene, when starting spontaneously, appears first in the toes. Dr. Smith found none there. That meant that the precipitating cause of its starting above the toes was due to a local injury or infection. There being no history of an original infection in that area and a positive showing of injury, he concluded that the latter was the precipitating cause. The blood-starved condition of the foot had been such that a slight trauma would easily set up a gangrene and the penetration of a hypodermic needle would be sufficient trauma to do so. An injection of 28cc of ozone would irritate or burn the starved tissues, distend them, cut off the circulation and cause death of the tissues and skin. Plaintiff at the time of Dr. Smith's first examination had a

gangrenous ulcer at the site of defendant's injection. Although Dr. Smith endeavored to do so, it was impossible to save the leg.

On March 30, 1954, a sudden change for the worse occurred and the upper thigh began to show a breakdown of tissues, a local gangrene which later proved to be the dry type. About the same time, a fresh thrombus completely blocked the popliteal artery (back of the knee). Dr. Smith called Dr. Atlas, another specialist, into consultation and an immediate amputation was deemed necessary. This was performed on April 2d, but there was so much infection and blood starvation that the stump would not heal and a second operation was necessary and was done on May 21, 1954.

Dr. Smith testified that in his opinion the original gangrene in the foot was precipitated by the injection given by defendant; that the popliteal blockage was caused by inflammation and infection spreading from the foot gangrene; also that the gangrene in the thigh was incipient when he first saw the patient but before the second operation was becoming more extensive and the tissues around it inflamed, thus requiring an operation above that area. He also said that the gangrene did not come down from the thigh to the foot and that the thigh condition alone would not have made an amputation inevitable. Dr. Atlas concurred in most of these conclusions. He said the injection was responsible for the primary necrosis in the foot; that infection was bound to occur sooner or later; that it had progressed to the groin before the operation; concerning the thigh he said he was unable to explain that area of gangrene but that it alone would not have required an amputation at the time of the operation; on the other hand the foot condition with its spreading infection had already doomed the leg. Clearly the evidence is sufficient to support a verdict for plaintiff and hence afford a proper basis for the granting of a new trial.

This conclusion does not reflect any weighing of opposing evidence. For instance, Dr. Elmquist, a well-qualified expert called by defendant, testified on the basis of hypothetical questions that the gangrene of the thigh would have caused the amputation of the leg regardless of the foot condition, but that he could not express an opinion as to the proximate cause of the gangrene in the foot. It is not our function to determine which expert expressed a sound opinion. We merely find that there is substantial evidence to sustain a verdict in favor of plaintiff had one been rendered.

 A chiropractor cannot lawfully pierce the skin of a patient for treatment purposes (*People* v. *Mangiagli,* 97 Cal.App.2d Supp. 935, 940 [218 P.2d 1025]) and under some authorities is held liable for any injuries caused thereby regardless of negligence in fact (*Whipple* v. *Grandchamp,* 261 Mass. 40 [158 N.E. 270, 57 A.L.R. 974] ; Anno. in 57 A.L.R. 974). Other cases apply to a chiropractor, or other practitioner who goes beyond the bounds of his license in treating a patient, the same standard of care which is required of practitioners, such as medical doctors, who are authorized to employ the particular method,—the absence of a license so to do being deemed not of the essence of a cause of action. (See *Kelly* v. *Carroll,* 36 Wn.2d 482 [219 P.2d 79, 19 A.L.R.2d 1174] ; Anno. in 19 A.L.R.2d 1188, 1204.) The latter seems to be the majority rule. But, after it is found that defendant pierced the skin of plaintiff with an injection used for treatment purposes, it is immaterial which of the above standards is applied to him. The evidence supports the conclusion that a chiropractor who injects ozone into the tissues (1) exceeds the privileges of his license and hence fails to conform to the chiropractic standard of knowledge and care, and (2) fails to conform to accepted standards of medical doctors who have rejected such method of treatment as positively harmful to the patient.

Appellant argues that there were causes other than the Guy injection which equally well could have precipitated the necrosis in the foot. Counsel cite the injection of novocain by Dr. Porter the day after the Guy injection, and the later lancing of the abscess in the Glendale hospital. The experts conceded that these traumas could have been precipitating causes. Therefore, argues appellant, plaintiff failed to carry her burden of proof that defendant's delict was the proximate cause of her gangrene.

 It is the law of this state that each of several joint tort feasors or independent wrongdoers who inflict simultaneous, or practically simultaneous, injuries upon a plaintiff must carry the burden of establishing that his own wrong did not contribute to the damages, or the extent to which it did so. (See *Copley* v. *Putter,* 93 Cal.App.2d 453, 457 [207 P.2d 876] ; *Cummings* v. *Kendall,* 41 Cal.App.2d 549, 558 [107 P.2d 282] ; *Finnegan* v. *Royal Realty Co.,* 35 Cal.2d 409, 433 [218 P.2d 17] ; Prosser on Torts, 2d ed., § 45, p. 226.) The Finnegan case says, at page 433 : ''Where several persons act in concert and damages result from their joint tort, each

person is held for the entire damages unless segregation as to causation can be established. Even though persons are not acting in concert, if the results produced by their acts are indivisible, each person is held liable for the whole. Death, burning of a building or the sinking of a boat are such indivisible results. The reason for imposing liability on each for the entire consequence is that there exists no basis for dividing damages and the law is loath to permit an innocent plaintiff to suffer as against a wrongdoing defendant. This liability is imposed where each cause is sufficient in itself as well as where each cause is required to produce the result. (15 So.Cal.L.Rev. 439.)'' *Copley* v. *Putter, supra,* at page 457: "If one of the wrongdoers could escape on the plea that his negligence was independent of that of the other tort feasor, both might leave the victim of their carelessness without a remedy. It would be a frustration of justice for the wronged person to be permitted to show his injury and the simultaneous negligence of the two tort feasors and be required to demonstrate which of the two had caused the damage." *Cummings* v. *Kendall, supra,* speaking of an indivisible injury, says at page 558: "On the other hand, since it is impossible to prove what share the act of either of the tortfeasors contributed, or whether it contributed any at all, if this prevailed, each would escape—an absurd result. To overcome this difficulty, the law imposes upon each tortfeasor the impossible burden of proof, contenting itself with limiting the injured person's total recovery to one indemnity. The situation is the same when one of the two contributing factors is not the result of actionable fault; again, the single tortfeasor cannot be allowed to escape through the meshes of a logical net. He is a wrongdoer; let him unravel the casuistries resulting from his wrong."

Appellant did not undertake to carry this burden. He will have an opportunity to do so at a new trial. Of course it is true, as argued by respondent, that it is not necessary for her to establish that defendant's tort was the proximate cause of the loss of the leg. She has proved a cause of action when she shows that defendant in treating her departed from accepted standards and that that caused her increased and prolonged pain. Whether it was the proximate cause of the gangrene, and if so was the cause of the amputation of the leg or the cause of the second operation, goes to the question of damages. But those inquiries if answered favorably to defendant's contentions would not deprive plaintiff of a

right to a new trial upon the lesser aspect of the case,—a malpractice resulting in pain and suffering.

There was no abuse of discretion in granting a new trial herein.

Order affirmed.

Moore, P. J., and Fox, J., concurred.