[Civ. No. 23388. Second Dist., Div. One. May 8, 1959.]

MURIEL M. BROWN, Appellant, v. RALPH I. GUY, Respondent.

Elmer Patrick Friel for Appellant.

Carl B. Sturzenacker, Albert Hampton and DeForrest Home for Respondent.

LILLIE, J.—This action, one for malpractice against the defendant, a chiropractor, has been twice tried and is now before this court on its merits a second time. At the first trial, the jury rendered its verdict for defendant, following which plaintiff's motion for a new trial was granted on the ground of the insufficiency of the evidence to support the same. This order was affirmed (*Brown* v. *Guy*, 144 Cal.App. 2d 659 [301 P.2d 413]), the evidence there and then being properly viewed in the light most favorable to plaintiff.

On retrial, the jury again returned a verdict for defendant. A motion for a new trial based on the insufficiency of the evidence and the asserted misconduct of the jury was denied. On appeal it is contended that the judgment lacks evidentiary support; and that the trial court erred in its refusal to give favorable consideration to affidavits of jurors in support of a new trial in refusing a requested instruction based on the "law of the case" and in the rejection of certain evidence claimed to be admissible.

Except for the testimony of four additional witnesses, the evidence at the retrial was substantially the same as that given at the former trial; in fact, a great portion of such evidence consisted of oral testimony at the first trial which by stipulation was read into evidence from the reporter's transcript. The record of the proceedings below has reached this court in the form of a settled statement plus the transcripts on the former appeal which are incorporated by reference. We had occasion to comment on the type of record thus presented when defendant unsuccessfully moved to dismiss the appeal for noncompliance with the applicable rules (*Brown* v. *Guy*, 167 Cal.App.2d 211 [334 P.2d 67]).

Although there is an implied suggestion by plaintiff that a different course should be followed, it is our duty herein to narrate the evidence in the aspect most favorable to defendant. The decision on the prior appeal, as already noted, was concerned solely with the question of whether the trial court abused its discretion in granting a new trial, and the appellate court's recitation of the facts necessarily presented the strongest possible statement of the plaintiff's case. Too, a reading of that opinion (144 Cal.App.2d 659) discloses that the court did not presume to indicate any view respecting the ultimate determination of the issues of fact presented in this controversy. Its observations, in short, were not binding on the jury evaluating the same testimony at the second trial and "did not foreclose it from exercising its own judgment as to the weight of the evidence, the credibility of the witnesses and the proper inferences and conclusions to be drawn therefrom" (*Kalfus* v. *Fraze*, 136 Cal.App.2d 415, 429 [288 P.2d 967]); and, of course, the rule is no different in malpractice actions where, as here, conflicting inferences are deducible from the testimony of medical experts (*Agnew* v. *City of Los Angeles*, 134 Cal.App.2d 433, 438 [286 P.2d 556]).

Plaintiff, then in her fifties, sustained a block or blood clot at the saddle of the aorta on September 13, 1953. This artery,

about the size of a garden hose, supplies blood to the vital organs inside the abdomen; at its saddle, or "Y," located near the pelvis, it divides into the right and left iliac arteries which continue down into the limbs and supply them with blood. The resulting obstruction of the arterial circulation produced a blood-starved condition in each leg, considerably more so in the right extremity. In such a case, according to all medical authorities, the onset of gangrene becomes imminent, which complication may arise either spontaneously from the insufficiency of blood supply or may be precipitated by minor trauma or infection. Since there is generally not sufficient circulation to heal even a minor bruise, preventive measures must be taken. As stated by a specialist who treated the plaintiff: "We warn these people, and very severely warn them, that they must under no circumstances injure that extremity or use strong chemicals . . . and never use any heat below (the) waist, particularly above the body temperature . . . any local injury in an extremity in which the circulation is deficient can start gangrene," which would include penetration of the tissues with a needle or some object of that character.

For two years prior to September 13, plaintiff experienced pain, cold and numbness in her legs. The condition turned acute on the evening of September 13 when she became nauseated after dinner and her legs, particularly the right extremity, grew numb and cold. Thereafter, this numb and painful condition of the right leg and foot continued without interruption. Seeking relief therefrom, she was treated from time to time by three osteopaths, a chiropractor and a physiotherapist. A practical nurse was engaged by plaintiff in mid-October. She testified that the plaintiff used a heat pad and a heat lamp on her right foot and also immersed it in hot water. In this latter connection, upon entering a hospital on November 16, 1953, plaintiff's history was taken by two different members of the staff and she mentioned the prior application of "hot packs" and "hot fulgerations" (sic); later she told still another doctor (Dr. Smith) that she had applied heat pads to her foot for two years prior to September of 1953.

On November 3, 1953, still without relief from constant pain, she consulted the defendant, a chiropractor whose practice was limited to that field of the healing arts. She directed attention to her right leg and foot and removed her footwear. After a brief examination, he told her he "couldn't help her one particle" but "would spray the Polyzone on the foot." He had purchased a polyzone machine six months previously

and limited its use to skin irritations. This machine passes oxygen over an electrical field, converting the oxygen into ozone which is a gaseous oxidizing agent of questionable therapeutic value (although one of defendant's witnesses, a medical doctor, stated that he found it beneficial for certain conditions and never observed any adverse results). Defendant's machine which was described and demonstrated to the jury, operates as follows: a rubber hose protrudes from the machine, attached to an ordinary oxygen tank, at the end of which hose a nozzle is permanently attached; various cannulae or tubes, which fit onto the end of the nozzle, can be inserted into the orifices of the body and the polyzone is sprayed into such orifices by pressing a button on the nozzle. As optional equipment, a 30-c.c. syringe, accompanied by a box of 12 hypodermic needles, may be furnished with the machine. By an operation unnecessary here to narrate, the syringe can be filled with the gaseous substance, removed from the machine and the hypodermic needle is then placed on the syringe. The use of this latter or injection technique by a chiropractor would concededly be unlawful; however, the spray technique is within the realm of proper chiropractic treatment and, according to one of plaintiff's experts, "would have no adverse effect whatever."

Plaintiff insists that defendant injected the substance into her foot; defendant insists he did not—that he only sprayed the area in question, and that during his 25 years of practice he had never used a hypodermic needle nor had one in his office. In this latter respect, he was corroborated by an associate who had officed with defendant for some 20 years. Opposing such claims, plaintiff and her witnesses described in detail the condition of the member following defendant's treatment. For example, plaintiff, upon arrival home, claims to have noticed a hole in her foot about the size of a needle, but a qualified medical witness for the defendant testified that a puncture hole is not apparent or visible after a needle of the size in question is withdrawn, owing to the elasticity of the skin.

About two days later, one Porter, another chiropractor, was called to plaintiff's house by plaintiff who injected novocaine around the site of the affected area which had taken the form of an ulcer. On November 16, 1953, plaintiff entered a Glendale hospital and placed herself under the care of an osteopathic physician on its staff. She gave this doctor a history of prior injections and, as previously recounted, the

use of heat applications. The abscess was lanced and found thereafter, upon laboratory examination of the tissue, to be sterile, although necrotic. Plaintiff was in the hospital until November 25, when she returned to her home. The pain in the right leg and foot having worsened, in January of 1954 she consulted two medical doctors, and finally in the following month, Dr. Lawrence Smith, a medical doctor specializing in surgery and diseases of the arteries and veins, particularly the extremities. He found that the foot was gangrenous with the possibility of the same condition in the right upper thigh. On April 2, 1954, it became necessary for Dr. Smith to amputate the limb high up in the thigh; he reamputated the stump on May 21, 1954. Plaintiff's life expectancy is now practically nil.

Based in great measure on the testimony of Dr. Smith, who made an outstanding witness for the plaintiff, she urges that there is no real conflict in the evidence and that we should adopt Dr. Smith's evaluation of the entire case as the only rational explanation of the misfortune she experienced. However, the difficulty in embracing this view lies in the fact that Dr. Smith's diagnosis assumed that polyzone was injected, not sprayed; and his testimony did not completely rule out the precipitation of gangrene by trauma, either in the form of the novocaine injection by Porter, the lancing of the abscess at the Glendale hospital, or plaintiff's use of heat applications. It must be borne in mind, too, that there is here no claim of wrongful diagnosis, but, as counsel for both parties concede, the sole question is this: "Did defendant give the injection?"

Plaintiff argues, and at great length, that the testimony of defendant and a certain supporting witness "is inherently improbable and physically impossible." For example, she states that an injection *"must* make a hole"; competent medical testimony says otherwise, at least to the extent that the hole would be visible, as claimed by plaintiff, some time later. Before an appellate court can reject as incredible testimony that has been believed by the trier of fact, such testimony must be "wholly unacceptable to reasonable minds" (*Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal. 2d 176, 183 [195 P.2d 427]), "unbelievable *per se*" (*Lane* v. *Safeway Stores, Inc.*, 33 Cal.App.2d 169, 175 [91 P.2d 160]), and such that "no reasonable person could believe the testimony" (*Tamble* v. *Downey*, 104 Cal.App.2d 810, 812 [232 P.2d 543]). We cannot say that the challenged testi-

mony belongs in any of these categories. Other physical facts are recounted and discussed by plaintiff which would be persuasive if addressed to a forum authorized to weigh the pros and cons thereof. The trial court denied a new trial after considering claims of an identical nature, and we are otherwise of the view that the evidence produced by the defense, particularly the inferences deducible therefrom, was of sufficient substantiality as to preclude any departure from the time-honored rule which has been stated and applied in a host of cases.

 It is next claimed that a new trial should have been granted because of untruthful answers given by a juror, Mrs. Montgomery, on *voir dire* examination. As required, the stenographic report of such proceedings has been supplied, together with the necessary affidavit that the facts therein set forth were not known before the verdict (*Dunford* v. *General Water Heater Corp.*, 150 Cal.App.2d 260, 265 [309 P.2d 958]). Also made a part of the record are the affidavits of three dissenting jurors which set forth occurrences during the deliberations which assertedly establish the offending juror's bias at the time of impanelment and concealed by her during *voir dire*.

During the proceedings prior to impanelment, Mrs. Montgomery denied knowing the defendant, the chiropractic group of which he was a member, or that particular field of the healing arts except in a general sort of way. In support of the motion for a new trial, affidavits were filed by plaintiff's attorney Mr. Friel, and three jurors, Mrs. Marchand (who voted for the defendant), Mrs. Marino and Mrs. Owens. The Friel affidavit averred that he met with the jury after its verdict had been returned and that Mrs. Montgomery then related an experience she had had with a medical doctor a year or two previously who gave her a "shot" which was in reality a "spray of ozone"; it was further averred that a few days later affiant telephoned Mrs. Montgomery and she told him that she knew a friend who knew the defendant and this friend had been benefited by food supplements sold by the defendant. Mrs. Marchand stated in her affidavit that during the course of the trial, "at I believe one of the recesses", Mrs. Montgomery stated she had a friend who had visited the defendant, had received food supplements from him and been benefited; that during the jury's deliberation Mrs. Montgomery related an experience of hers with ozone therapy. Juror Marino's affidavit recounted statements by Mrs. Montgomery during deliberations to the effect that the latter had

received an ozone spray from a medical doctor and that the spray felt like an injection. Juror Owens corroborated the foregoing allegations of Mrs. Marino.

A counteraffidavit was filed by Mrs. Montgomery in which it is alleged that on one occasion during the trial she orally "wondered" if the defendant could be the same doctor from whom a friend of hers had once received some type of food supplement and made such a remark only once; that during *voir dire* and during the trial she did not know whether the defendant was the doctor visited by her friend and was not sure of that fact until the trial had been concluded. There do not appear to be any denials of the several averments respecting her statements to fellow jurors of familiarity with ozone treatments, but she does deny that she recalled such prior experiences during the course of the jury's impanelment. The affidavits of five other jurors tended to negative those of the moving party.

██ The granting or denial of a motion for a new trial rests so completely within the discretion of the trial court that an appellate court will not interfere unless a patent abuse of discretion appears. There must first be an "affirmative showing of a gross, manifest or unmistakable abuse of discretion" (*Schultz* v. *Sussman,* 7 Cal.App.2d 100, 102 [45 P.2d 409]). ██ Because it is necessary to prevent instability of verdicts and harassment of jurors, a juror should be permitted to impeach a verdict only in instances "violating the plainest principles of justice" (*Kollert* v. *Cundiff,* 50 Cal.2d 768, 773-774 [329 P.2d 897]). ██ Whether those principles were here violated was committed to the trial judge in the first instance. Since all intendments are in favor of the action taken by the lower court, the affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but all facts reasonably inferred from those stated (*DeWit* v. *Glazier,* 149 Cal.App.2d 75, 82 [307 P.2d 1031]). In *People* v. *Webb,* 143 Cal.App.2d 402 [300 P.2d 130], the court reviewed an order denying a new trial based on a juror's misconduct. The rule here germane was again stated: "The trial court by its ruling denying the motion for a new trial necessarily impliedly found that Bradley did not misrepresent his state of mind on the *voir dire* examination. This finding cannot be reversed in the absence of a showing of a clear abuse of discretion." Too, it does not appear that Mrs. Montgomery's actions constituted proof of intentional (conscious) concealment. In *Mast* v. *Claxton,*

107 Cal.App. 59 [290 P. 48], a juror failed to disclose that one of the attorneys had previously represented him. The court pointed out that to justify the granting of a new trial on that ground, "it must be shown that some prejudice resulted to the appellant, or that there was a wilfully false and untruthful answer given by the juror, which would lead to the inference that the juror was animated by a dishonest motive in qualifying" (p. 67). In the instant case, the trial court impliedly found that no such dishonest motives existed on the part of the juror concerned, and the record contains substantial support for such finding. Nor is there any affirmative showing of resulting prejudice sufficient to warrant a reversal. True, the jury stood nine to three, and Mrs. Marchand voted with the majority; but there is no averment in her affidavit or those of the other two jurors that Mrs. Montgomery's actions or remarks affected their independent judgment (*Woods* v. *Pacific Greyhound Lines*, 91 Cal.App.2d 572, 576 [205 P.2d 738]). Furthermore, the trial court was in a far better position than this court to determine whether plaintiff was prejudiced, and her claims in that regard were rejected.

 It is further contended the trial court committed reversible error in refusing certain instructions offered by the plaintiff on the principles governing the liability of independent wrongdoers. Those principles were correctly stated in the prior opinion of this court (144 Cal.App.2d 659, 666-667), and are embodied in a single instruction which was submitted by the plaintiff and read to the jury with certain modifications and deletions. Complaint is now made that two additional instructions on the same general subject, but more applicable to the case from plaintiff's viewpoint, should also have been given. The claim is without merit. A party is not entitled to have the jury instructed in any particular language as long as the court announces the substance of the law applicable to the case (*Hooper* v. *Bronson*, 123 Cal.App.2d 243, 255 [266 P.2d 590]), "Instructions should not draw the jury's attention to particular facts. It is error to give and proper to refuse an instruction that unduly emphasizes issues, theories or defenses either by repetition or by singling them out or making them unduly prominent although the instruction may be a legal proposition" (*City of Los Angeles* v. *Frew*, 139 Cal. App.2d 859, 872 [294 P.2d 1073]).

 The final contention relates to the court's refusal to permit testimony assertedly showing a scheme or plan by defendant to attract customers to his offices by the sale of food

supplements, which scheme tended to represent that he was more qualified than the average chiropractor and, as applied to plaintiff, could give injections. Reliance is had on *Firlotte* v. *Jessee,* 76 Cal.App.2d 207 [172 P.2d 710], a breach of contract action, wherein reference is made to section 1868 of the Code of Civil Procedure on the avoidance of collateral questions. As the statute declares, the determination whether inquiry into such matters should be permitted is within the discretion of the court and the scheme here in question was certainly collateral to the main issue presented by the pleadings. Under the circumstances, no prejudice is manifest.

The judgment is affirmed.

White, P. J., and Fourt, J., concurred.